Larry BENNETT, Plaintiff,

v.

CALABRIAN CHEMICALS
CORPORATION,
Defendant.

No. 1:03–CV–238.

United States District Court,
E.D. Texas,
Beaumont Division.

June 9, 2004.

Leanne Johnson, Stephanie Donean Surratt, Orgain, Bell & Tucker, Beaumont, TX, for Calabrian Chemicals Corporation, Defendant.

John Gerard Werner, Reaud, Morgan & Quinn Inc., Beaumont, TX, for Larry Bennett, Plaintiff.

## MEMORANDUM AND ORDER

CRONE, District Judge.

Pending before the court is Defendant Calabrian Corporation's ("Calabrian") (incorrectly named as Calabrian Chemicals Corporation) Motion for Summary Judgment (# 14). Calabrian seeks summary judgment on Plaintiff Larry Bennett's ("Bennett") claims of employment discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12113, and Title 1 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a. Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that summary judgment is warranted.

### I. Background

Bennett was hired on May 15, 1981, as a maintenance worker at Calabrian's chemical manufacturing plant in Port Neches, Texas. During his employment with Calabrian, Bennett worked as a maintenance supervisor, operator, storeroom keeper, shift supervisor, and shift foreman. While employed at Calabrian, he underwent three aortofemoral bypass surgeries over a nineteen-month time span for his condition of arterial occlusive disease. The first surgery was performed on March 3, 1999. Bennett was hospitalized for four days and then returned to work when he was released. On September 12, 2001, Bennett had his second surgery, and on October 31, 2001, he underwent his final aortofemoral bypass surgery. He did not return to work between the last two surgeries. On November 8, 2001, Bennett's cardiovascular surgeon, Neal Foley, M.D. ("Dr. Foley"), signed a release allowing Bennett to return to work without restrictions effective November 26, 2001. The next day, November 27, 2001, Bennett requested a change in his work schedule from a rotating shift to a straight day position. Bennett made this request because his physician had purportedly informed him that "working on a rotating shift was not a good thing for him in terms of his medication and sleep patterns." Bennett's request was denied by Calabrian because no straight day positions were available. According to Dave Maneman ("Maneman"), plant manager at Calabrian, Bennett had made similar requests prior to his surgeries, which were also denied because there were no such vacancies.

On December 14, 2001, Bennett submitted a request for short-term disability benefits to Calabrian due to his medical condition—arterial occlusive disease and three aortofemoral bypass surgeries. The request included a notation by Dr. Foley stating that Bennett had been totally disabled from October 31, 2001, to November 26, 2001. Calabrian's insurance carrier denied the request because Bennett had been released to return to work without restrictions on November 26, 2001. Subsequently, Bennett made a second request for disability benefits on January 22, 2002, which included a statement by Dr. Foley that Bennett "should be on full disability due to [the same] condition." Based on his new claim of disability, Calabrian's insurance carrier approved the claim, and Bennett was paid short-term disability benefits for approximately twenty-six weeks.

In addition, on January 23, 2002, Bennett requested a personal medical leave of absence until May 15, 2002. His request was approved by Calabrian. While out on medical leave, Bennett refereed football and baseball games for compensation. In May 2002, Bennett submitted another release signed by Dr. Foley on April 30, 2002, allowing him to return to work without restrictions effective May 3, 2002. On May 2, 2002, Bennett provided Calabrian with another letter from Dr. Foley indicating that Bennett was able to return to work without restrictions, stating that he is "no longer suffering from the symptoms that caused the disability." At deposition, Bennett testified that he was attempting to be re-hired "prior to the benefits being terminated."

As a consequence, Bennett's submission aroused the suspicions of Charles Cogliandro ("Cogliandro"), president and chief executive officer of Calabrian. At deposition, Cogliandro testified that he did not believe Bennett was disabled and unable to perform his job. As a consequence, Cogliandro requested Bennett's personnel and medical file for review. After reviewing the files, Cogliandro asked Bennett to provide additional information to explain the difference in his condition between the work release of November 26, 2001, his request for disability benefits on January 22, 2002, and the release submitted on May 2, 2002. Bennett submitted another letter, signed by Dr. Foley on June 24, 2002, that reiterates his opinion that "the aortofemoral bypass has alleviated all of his symptoms relative to vascular disease, and [Dr. Foley] expect[s] that he will get an excellent outcome, which will allow him to engage in full physical activities for at least ten years." Dr. Foley elaborates that he does not "believe vascular disease in any way contributes to any current disabilities, and [Dr. Foley] would recommend him to be allowed to engage in full employment at this time."

After reviewing Bennett's submission, Cogliandro informed Amber McDonald ("McDonald"), the human resources manager, that the information was not acceptable to explain the discrepancies in Dr. Foley's statements. Calabrian informed Bennett that "a release from Dr. Foley must state that he no longer has the condition in order for [Bennett] to return to work." According to Cogliandro, Bennett failed to comply with that request and was prohibited from returning to work. As a result, Bennett's position at Calabrian was filled by another employee.

After Bennett was terminated, he filed a charge with the Equal Employment Opportunity Commission ("EEOC") and the Texas Commission on Human Rights ("TCHR"), alleging that Calabrian had discriminated against him on the basis of his disability. Bennett indicated in his EEOC and TCHR charge that the discrimination took place when he was discharged on July 22, 2002. Bennett received his right to sue

letter on March 20, 2003, and instituted this action on April 22, 2003. In his complaint, Bennett claims to the victim of disability discrimination in violation of the ADA. Specifically, Bennett asserts that Calabrian discharged him, a qualified individual with a disability,

> who was able to perform the essential functions of his position with or without reasonable accommodation, because of his disability, Arterialocdasive [sic] Disease; Defendant's discharge and/or constructive discharge of Larry Bennett based on the need to make reasonable accommodations to his possible future physical impairments; and retaliatory action against Plaintiff, including but not limited to stating Plaintiff could not work because of his medical condition and a release was not good enough unless it stated the medical condition disappeared.

On May 30, 2003, Calabrian filed a counterclaim against Bennett alleging that his actions in accepting disability benefits were "willful and fraudulent." Specifically, Calabrian asserts that Bennett "fraudulently obtained disability benefits by stating that he could not work. Then after exhausting his disability benefits, he then stated that he could return to work without restriction. In addition, he accepted disability benefits stating that he could not work, all the while officiating football games." Calabrian contends that Bennett "attempted to manipulate the process by first claiming he had a disability to obtain money and then claiming that he did not have a disability, even though his condition has not changed."

Calabrian filed its motion for summary judgment on January 15, 2004, arguing that Bennett is not disabled and that Calabrian never "regarded" him as having a disability. Moreover, Calabrian maintains that the decision not to allow Bennett to return to work was based upon Coglian-

dro's suspicion and belief that Bennett was not disabled and that he was deceiving the company by receiving disability benefits. Therefore, according to Calabrian, "[s]ince Bennett does not have a disability and was never regarded by Calabrian as having a disability, Bennett fails to qualify for relief under the ADA."

## II. *Analysis*

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003); *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002); *Colson v. Grohman*, 174 F.3d 498, 506 (5th Cir.1999).

"A fact is *'material'* if it *'might affect* the outcome of the suit under governing law.'" *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir.2001) (emphasis in original) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir.2001); *Merritt–*

*Campbell, Inc. v. RxP Prods., Inc.,* 164 F.3d 957, 961 (5th Cir.1999); *Burgos v. Southwestern Bell Tel. Co.,* 20 F.3d 633, 635 (5th Cir.1994). "An issue is *'genuine'* if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan,* 246 F.3d at 489 (emphasis in original). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *accord Harken Exploration Co.,* 261 F.3d at 471; *Merritt-Campbell, Inc.,* 164 F.3d at 961. The moving party, however, need not negate the elements of the nonmovant's case. *See Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996) (citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *See Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Rushing v. Kansas City S. Ry. Co.,* 185 F.3d 496, 505 (5th Cir.1999), *cert. denied,* 528 U.S. 1160, 120 S.Ct. 1171, 145 L.Ed.2d 1080 (2000); *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075. "[T]he court must review the record 'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348). All the evidence must be construed "in the light most favorable to the nonmoving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.,* 98 F.3d 179, 181 (5th Cir.1996); *see Reeves,* 530 U.S. at 150, 120 S.Ct. 2097; *Brown v. City of Houston,* 337 F.3d 539, 541 (5th Cir. 2003); *Harken Exploration Co.,* 261 F.3d at 471; *Daniels v. City of Arlington,* 246 F.3d 500, 502 (5th Cir.), *cert. denied,* 534 U.S. 951, 122 S.Ct. 347, 151 L.Ed.2d 262 (2001); *Colson,* 174 F.3d at 506. The evidence of the non-movant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in his favor. *See Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505); *Martinez,* 338 F.3d at 411; *Gowesky v. Singing River Hosp. Sys.,* 321 F.3d 503, 507 (5th Cir.), *cert. denied,* —— U.S. ——, 124 S.Ct. 66, 157 L.Ed.2d 30 (2003); *Harken Exploration Co.,* 261 F.3d at 471; *Christopher Vill. Ltd. P'ship v. Retsinas,* 190 F.3d 310, 314 (5th Cir.1999).

Nevertheless, "'only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 469 n. 14, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (emphasis in original) (quoting *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.,* 879 F.2d 1005, 1012 (2d Cir.1989)). "If the [nonmoving party's] theory is ... senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id.* at 468–69, 112 S.Ct. 2072. The nonmovant's burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evidence." *Little,* 37 F.3d at 1075; *see Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505; *Wallace,* 80 F.3d at 1047; *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)). "Unsubstantiated assertions,

improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown,* 337 F.3d at 541; *see Bridgmon v. Array Sys. Corp.,* 325 F.3d 572, 577 (5th Cir. 2003); *Hugh Symons Group, plc v. Motorola, Inc.,* 292 F.3d 466, 468 (5th Cir.), *cert. denied,* 537 U.S. 950, 123 S.Ct. 386, 154 L.Ed.2d 295 (2002). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *See Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548; *Wenner v. Texas Lottery Com'n,* 123 F.3d 321, 324 (5th Cir.1997), *cert. denied,* 523 U.S. 1073, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

### B. *Americans with Disabilities Act*

■ Bennett argues that Calabrian discriminated against him in violation of federal law on the basis of his physical condition. The ADA is a federal antidiscrimination statute designed to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to individuals without a disability. *See* 42 U.S.C. §§ 12101–12113; 29 C.F.R. § 1630, App.; *Mason v. United Air Lines,* 274 F.3d 314, 316 (5th Cir. 2001); *Aldrup v. Caldera,* 274 F.3d 282, 286 (5th Cir.2001); *Holtzclaw v. DSC Communications. Corp.,* 255 F.3d 254, 258 (5th Cir.2001); *Ivy v. Jones,* 192 F.3d 514, 516 (5th Cir.1999); *Seaman v. CSPH, Inc.,* 179 F.3d 297, 300 (5th Cir. 1999); *Burch v. Coca–Cola Co.,* 119 F.3d 305, 313 (5th Cir.1997), *cert. denied,* 522 U.S. 1084, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998). Title I of the Act, which covers employment discrimination, provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 560 n. 7, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999); *Flowers v. Southern Reg'l Physician Servs., Inc.,* 247 F.3d 229, 233 (5th Cir.2001); *Dupre v. Charter Behavioral Health Sys. of Lafayette Inc.,* 242 F.3d 610, 613 n. 2 (5th Cir.2001); *Allen v. Rapides Parish Sch. Bd.,* 204 F.3d 619, 621 (5th Cir.2000); *Seaman,* 179 F.3d at 300. "The ADA seeks to eliminate unwarranted discrimination against disabled individuals in order both to guarantee those individuals equal opportunity and to provide the Nation with the benefit of their consequently increased productivity." *Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 801, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (citing 42 U.S.C. § 12101(a)(8), (9)). Employees asserting claims under Title I of the ADA are required to follow the procedures applicable to Title VII actions, including the timely filing of an EEOC charge. *See* 42 U.S.C. § 12117(a); *EEOC v. Waffle House, Inc.,* 534 U.S. 279, 285–86, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002); *Zimmerman v. Oregon Dep't of Justice,* 170 F.3d 1169, 1172 (9th Cir.1999), *cert. denied,* 531 U.S. 1189, 121 S.Ct. 1186, 149 L.Ed.2d 103 (2001); *Wagner v. Texas A & M Univ.,* 939 F.Supp. 1297, 1309 (S.D.Tex.1996).

The ADA defines a "qualified individual with a disability" as "an individual with a

disability who, with or without a reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 193, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002); *Cleveland,* 526 U.S. at 801, 119 S.Ct. 1597; *Mason,* 274 F.3d at 316; *Holtzclaw,* 255 F.3d at 258; *Giles v. General Elec. Co.,* 245 F.3d 474, 486 (5th Cir.2001). "The ADA prohibits discrimination on the basis of disability 'to ensure that [such] individuals are not denied jobs or other benefits because of the prejudiced attitudes or the ignorance of others.'" *Deas v. River West, L.P.,* 152 F.3d 471, 482 (5th Cir. 1998), *cert. denied,* 527 U.S. 1035, 119 S.Ct. 2392, 144 L.Ed.2d 793 (1999) (quoting *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 284, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)).

### 1. *Prima Facie Case and Burden of Proof*

■ To recover under the ADA, the plaintiff must prove that he was discriminated against on the basis of his disability. *See Holtzclaw,* 255 F.3d at 258; *Giles,* 245 F.3d at 486; *McInnis v. Alamo Cmty. Coll. Dist.,* 207 F.3d 276, 282 (5th Cir. 2000); *Gonzales v. City of New Braunfels,* 176 F.3d 834, 836 (5th Cir.1999); *Talk v. Delta Airlines, Inc.,* 165 F.3d 1021, 1024 (5th Cir.1999). The plaintiff may present either direct evidence of disability discrimination or employ an indirect method of proof utilized in other types of employment discrimination cases. *See McInnis,* 207 F.3d at 282 (citing *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir.1996)); *Allen,* 204 F.3d at 623 n. 3; *Seaman,* 179 F.3d at 300; *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In the absence of direct evidence of discrimination, the plaintiff can establish a *prima facie* case under the ADA by showing that:

(1) he has a "disability";

(2) he is qualified for the job;

(3) he was subject to an adverse employment action; and

(4) he was replaced by a non-disabled person or was treated less favorably than non-disabled employees.

*See Gowesky,* 321 F.3d at 511; *Aldrup,* 274 F.3d at 286; *McInnis,* 207 F.3d at 279–80; *Seaman,* 179 F.3d at 300; *Burch,* 119 F.3d at 320.

■ If the plaintiff succeeds in making this *prima facie* showing, a rebuttable presumption of discrimination arises, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *See Gowesky,* 321 F.3d at 511; *Aldrup,* 274 F.3d at 286; *McInnis,* 207 F.3d at 280; *Daigle v. Liberty Life Ins. Co.,* 70 F.3d 394, 396 (5th Cir.1995) (citing *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). While the employer need not prove that its actions were motivated by the legitimate reason, it must produce some evidence in support of its proffered rationale. *See Daigle,* 70 F.3d at 396 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507–10, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)); *EEOC v. Texas Bus Lines,* 923 F.Supp. 965, 970 (S.D.Tex.1996). The defendant's burden is merely one of production and not of persuasion. *See Burdine,* 450 U.S. at 257–58, 101 S.Ct. 1089. "If the employer produces any evidence 'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action,' then the employer has satisfied its burden of production." *Daigle,* 70 F.3d at 396 (quoting *Hicks,* 509 U.S. at 507, 113 S.Ct. 2742); *see Texas Bus Lines,* 923 F.Supp. at 970.

■ If the employer meets its burden of production, the presumption is dis-

solved, and the burden shifts back to the plaintiff to demonstrate that the proffered reason is a pretext for discrimination—the defendant's alleged nondiscriminatory reason is false and the real reason for the adverse action is disability discrimination. *See Aldrup,* 274 F.3d at 286 (citing *McDonnell Douglas Corp.,* 411 U.S. at 804, 93 S.Ct. 1817); *McInnis,* 207 F.3d at 282; *Daigle,* 70 F.3d at 396. As with discrimination cases generally, the plaintiff at all times bears the ultimate burden of persuading the trier of fact that he has been the victim of illegal discrimination based on his disability. *See Seaman,* 179 F.3d at 300; *Daigle,* 70 F.3d at 396 (citing *Hicks,* 509 U.S. at 511, 113 S.Ct. 2742). To prevail on an ADA claim, the plaintiff must prove that an adverse employment decision was made "solely because of his disability." *Gonzales,* 176 F.3d at 836; *see McInnis,* 207 F.3d at 282; *Still v. Freeport–McMoran, Inc.,* 120 F.3d 50, 51–52 (5th Cir.1997). The ADA does not prohibit adverse action due to a consequence of a disability, such as being unable to report to work regularly or to perform essential job duties as a result of an injury or illness. *See Hypes on Behalf of Hypes v. First Commerce Corp.,* 134 F.3d 721, 726–27 (5th Cir.1998) (citing 42 U.S.C. § 12112(a)); *Matthews v. Commonwealth Edison Co.,* 128 F.3d 1194, 1195–96 (7th Cir.1998); *Rogers v. International Marine Terminals,* 87 F.3d 755, 759–60 (5th Cir. 1996). Thus, the ADA does not insulate an employee from adverse action taken by an employer because of misconduct in the workplace, even if his improper behavior is arguably attributable to an impairment. *See Hamilton v. Southwestern Bell Tel. Co.,* 136 F.3d 1047, 1052 (5th Cir.1998); *Burch,* 119 F.3d at 319 n. 14. In short, an employee "can not hide behind the ADA and avoid accountability for his actions." *Hamilton,* 136 F.3d at 1052.

2. *Existence of Disability under the ADA*

■ The threshold requirement in any case brought under the ADA is a showing that the plaintiff suffers from a disability protected under the Act. *See Dupre,* 242 F.3d at 613; *Hamilton,* 136 F.3d at 1050; *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1119 (5th Cir.1998); *Rogers,* 87 F.3d at 758. "[W]hether a person has a disability under the ADA is an individualized inquiry." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). The ADA defines a disability as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2); *see Williams,* 534 U.S. at 193, 122 S.Ct. 681; *Blanks v. Southwestern Bell Communications, Inc.,* 310 F.3d 398, 400 (5th Cir.2002); *Aldrup,* 274 F.3d at 286; *Ivy,* 192 F.3d at 516; *Talk,* 165 F.3d at 1024; *Deas,* 152 F.3d at 475; *Pryor v. Trane Co.,* 138 F.3d 1024, 1026 (5th Cir.1998); *Hamilton,* 136 F.3d at 1050; *Sherrod,* 132 F.3d at 1119. The ADA further restricts the meaning of physical and mental impairment to:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as mental retardation, organic

brain syndrome, emotional or mental illness, and specific learning disabilities. 29 C.F.R. § 1630.2(h)(1), (2); *see Williams*, 534 U.S. at 194–95, 122 S.Ct. 681 (quoting 45 C.F.R. § 84(j)(2)(i) (2001)); *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 n. 5 (5th Cir.1995). "[M]erely having an impairment does not make one disabled for purposes of the ADA." *Williams*, 534 U.S. at 195, 122 S.Ct. 681. "A physical impairment, standing alone, is not necessarily a disability as contemplated by the ADA. The statute requires an impairment that substantially limits one or more of the major life activities." *Dutcher*, 53 F.3d at 726; *accord Williams*, 534 U.S. at 195, 122 S.Ct. 681; *Nawrot v. CPC Int'l*, 277 F.3d 896, 903 (7th Cir.2002) (noting that "not all Plaintiffs with health conditions have a 'disability' within the meaning of the ADA"); *Dupre*, 242 F.3d at 614; *Deas*, 152 F.3d at 479.

### a. Impairment Substantially Limiting a Major Life Activity

The ADA defines neither "substantially limits" nor "major life activities," but the EEOC's regulations under the ADA, which adopt the same definition of major life activities as used in the Rehabilitation Act, provide significant guidance. *See Dupre*, 242 F.3d at 614; *Dutcher*, 53 F.3d at 726; *see also Talk*, 165 F.3d at 1024; *Hamilton*, 136 F.3d at 1050; *but see Williams*, 534 U.S. at 194, 122 S.Ct. 681 ("[t]he persuasive authority of the EEOC regulations is less clear. . . . [n]o agency has been given authority to issue regulations interpreting the term 'disability' in the ADA"). " 'Major life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.' " *Talk*, 165 F.3d at 1024–25; *see Hamilton*, 136 F.3d at 1050 (quoting 29 C.F.R. § 1630.2(i)); *Dutcher*, 53 F.3d at 726; *see also Williams*, 534 U.S. at 195, 122 S.Ct. 681 (quoting 45 C.F.R.

§ 84.3(j)(2)(ii)(2001)); *Mason*, 274 F.3d at 317; *Aldrup*, 274 F.3d at 286. " 'The statutory language, requiring a substantial limitation of a major life activity, emphasizes that the impairment must be a significant one.' " *Deas*, 152 F.3d at 479 (quoting *Forrisi v. Bowen*, 794 F.2d 931, 933–34 (4th Cir.1986)). A "fundamental statutory requirement" is that "only impairments causing 'substantial limitat[ions] in individuals' ability to perform major life activities constitute disabilities." *Kirkingburg*, 527 U.S. at 565, 119 S.Ct. 2162; *see Williams*, 534 U.S. at 195, 122 S.Ct. 681; *Waldrip v. General Elec. Co.*, 325 F.3d 652, 655 (5th Cir.2003) ("an impairment must not just limit or affect, but must *substantially* limit a major life activity") (emphasis in original).

Indeed, "using 'working' *per se* as a major life activity is a questionable theory under the ADA, in light of two Supreme Court opinions." *Stevens v. Goodyear Tire & Rubber Co.*, Civil Action No. 01–1371, at 15, 2002 WL 32123912 (S.D.Tex. July 31, 2002), *aff'd*, 61 Fed. Appx. 923, No. 02–21007, 2003 WL 1113981 (5th Cir. Feb.21, 2003) (citing *Williams*, 534 U.S. at 200, 122 S.Ct. 681; *Sutton*, 527 U.S. at 492, 119 S.Ct. 2139). "Because of the conceptual difficulties inherent in the argument that working could be a major life activity, we have been hesitant to hold as much." *Williams*, 534 U.S. at 200, 122 S.Ct. 681. In *Williams*, the Court construed the phrase "major life activities" as referring only "to those activities that are of central importance to daily life," including "such basic abilities as walking, seeing, and hearing." *Id.* at 197, 122 S.Ct. 681. The Court also stated that the term "substantially" precludes "impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities" under the ADA. *Id.* "[T]hese terms need to be interpreted strictly to create a

demanding standard for qualifying as disabled." *Id.*

■ The factors to be considered in determining whether an impairment substantially limits a major activity include:

(1) the nature and severity of the impairment;

(2) its duration or expected duration; and

(3) its permanent or expected permanent or long-term impact.

*See Williams,* 534 U.S. at 196, 122 S.Ct. 681 (quoting 29 C.F.R. § 1630.2(j)(2)(i)-(iii)); *Dupre,* 242 F.3d at 614 (quoting *Sutton,* 527 U.S. at 479, 119 S.Ct. 2139); *Pryor,* 138 F.3d at 1026; *Hamilton,* 136 F.3d at 1050; *see also Deas,* 152 F.3d at 480. " '[T]emporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities.' " *Pryor,* 138 F.3d at 1026 (quoting 29 C.F.R. § 1630, App., § 1630.2(j)); *see Williams,* 534 U.S. at 198, 122 S.Ct. 681; *Hamilton,* 136 F.3d at 1051; *Rogers,* 87 F.3d at 759. Furthermore, when determining whether an individual is substantially limited in a major life activity, corrective and mitigating measures, such as medication and assisting devices, must be taken into account. *See Sutton,* 527 U.S. at 482, 119 S.Ct. 2139; *Cooper v. Olin Corp.,* 246 F.3d 1083, 1088 (8th Cir. 2001); *Cash v. Smith,* 231 F.3d 1301, 1305 n. 4 (11th Cir.2000); *Ivy,* 192 F.3d at 516; *Spades v. City of Walnut Ridge,* 186 F.3d 897, 900 (8th Cir.1999); *EEOC v. R.J. Gallagher Co.,* 181 F.3d 645, 654 (5th Cir. 1999). "A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity." *Sutton,* 527 U.S. at 482–83, 119 S.Ct. 2139.

The EEOC's regulations define "substantially limited" as meaning:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity.

29 C.F.R. § 1630.2(j)(i), (ii); *see Williams,* 534 U.S. at 195–96, 122 S.Ct. 681; *Talk,* 165 F.3d at 1025 n. 6; *Deas,* 152 F.3d at 480; *Pryor,* 138 F.3d at 1026 n. 12; *Hamilton,* 136 F.3d at 1050 n. 5; *Sherrod,* 132 F.3d at 1119; *Dutcher,* 53 F.3d at 726 n. 8. " 'To determine whether a person is substantially limited in a major life activity other than working, we look to whether that person can perform the normal activities of daily living.' " *Pryor,* 138 F.3d at 1027 (quoting *Ray v. Glidden Co.,* 85 F.3d 227, 229 (5th Cir.1996)); *accord Williams,* 534 U.S. at 196, 122 S.Ct. 681; *Sherrod,* 132 F.3d at 1120. Disability status is ascertained on a case-by-case basis, as " '[t]he determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.' " *Sutton,* 527 U.S. at 483, 119 S.Ct. 2139 (quoting 29 C.F.R. Pt. 1630.2(j), App.); *accord Williams,* 534 U.S. at 198, 122 S.Ct. 681; *Kirkingburg,* 527 U.S. at 566, 119 S.Ct. 2162; *see Zenor v. El Paso Healthcare Sys., Ltd.,* 176 F.3d 847, 860 (5th Cir.1999) (citing *Burch,* 119 F.3d at 315); *Deas,* 152 F.3d at 478. "The particularized inquiry mandated by the ADA centers on substantial limitation of major life activities, not mere impairment." *Ivy,* 192 F.3d at 516 (citing *Sutton,* 527 U.S. at 482, 119 S.Ct. 2139); *see Williams,* 534 U.S. at 198, 122 S.Ct. 681 (citing *Kirkingburg,* 527 U.S. at 565, 119 S.Ct. 2162).

While "working" is considered by many courts to be a major life activity, working " 'does not necessarily mean working at a particular job of one's choice.' " *Bridges v. City of Bossier,* 92 F.3d 329, 335 (5th Cir.1996), *cert. denied,* 519 U.S. 1093, 117 S.Ct. 770, 136 L.Ed.2d 715 (1997) (quoting *Bolton v. Scrivner, Inc.,* 36 F.3d 939, 942 (10th Cir.1994), *cert. denied,* 513 U.S. 1152, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995)); *accord Dupre,* 242 F.3d at 614; *Allen,* 204 F.3d at 622–23; *Deas,* 152 F.3d at 480–81. "Only if there is no evidence of impairment to the other major life functions is an impairment to working considered." *Talk,* 165 F.3d at 1025 (citing *Hamilton,* 136 F.3d at 1050 (citing *Dutcher,* 53 F.3d at 726 n. 10)); *accord Pryor,* 138 F.3d at 1026 n. 15.

" '[S]*ubstantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.' " *Williams,* 534 U.S. at 200, 122 S.Ct. 681 (emphasis in original) (quoting 29 C.F.R. § 1630.2(j)(3)); *accord Talk,* 165 F.3d at 1025. " 'The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.' " *Id.* (quoting 29 C.F.R. § 1630.2(j)(3)(i)); *accord Dupre,* 242 F.3d at 614; *Zenor,* 176 F.3d at 860; *Deas,* 152 F.3d at 481; *Pryor,* 138 F.3d at 1027; *Hamilton,* 136 F.3d at 1051; *Sherrod,* 132 F.3d at 1120; *see Mason,* 274 F.3d at 317. An employee's "inability to perform one aspect of [his] job while retaining the ability to perform the work in general does not amount to a substantial limitation of the activity of working." *Dutcher,* 53 F.3d at 727 (citing *Chandler v. City of Dallas,* 2 F.3d 1385, 1392 (5th Cir.1993), *cert. denied,* 511 U.S. 1011, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994) (citing *Elstner v. Southwestern Bell Tel. Co.,* 659 F.Supp. 1328, 1343 (S.D.Tex.1987), *aff'd,* 863 F.2d 881 (5th Cir.1988))); *see*

*Williams,* 534 U.S. at 200, 122 S.Ct. 681 (citing *Sutton,* 527 U.S. at 492, 119 S.Ct. 2139); *Dupre,* 242 F.3d at 614 (citing *Pryor,* 138 F.3d at 1027).

" 'An impairment that affects only a narrow range of jobs can be regarded either as not reaching a major life activity or as not substantially limiting one.' " *Sherrod,* 132 F.3d at 1120 (quoting *Chandler,* 2 F.3d at 1392); *see Blanks,* 310 F.3d at 401; *Knapp v. Northwestern Univ.,* 101 F.3d 473, 479 (7th Cir.1996), *cert. denied,* 520 U.S. 1274, 117 S.Ct. 2454, 138 L.Ed.2d 212 (1997) (citing *Jasany v. United States Postal Serv.,* 755 F.2d 1244, 1249 n. 3 (6th Cir.1985)); *Dutcher,* 53 F.3d at 727. The Supreme Court has stated that nothing in the Act, the Court's previous opinions, or the regulations suggests that in the context of major life activities other than working, classes or ranges within those activities should be considered. *See Williams,* 534 U.S. at 200, 122 S.Ct. 681. Therefore, "[w]hen addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with [his] specific job." *Id.* "As a result, occupation-specific tasks may have only limited relevance to the manual task inquiry." *Id.*

■ An ADA claimant must prove that he was disabled at the time of the alleged discriminatory act. *See Cash,* 231 F.3d at 1306 (disability must be evaluated as manifested at the time of the challenged employment action); *McDaniel v. Mississippi Baptist Med. Ctr.,* 877 F.Supp. 321, 326–27 (S.D.Miss.), *aff'd,* 74 F.3d 1238 (5th Cir.1995) (plaintiff must be a "qualified individual with a disability" at the time the adverse action occurred); *see also Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 884 (6th Cir.1996) (plaintiff must establish

as part of *prima facie* case that she was a qualified individual with a disability at the time of the discriminatory act). "The legislative history of the ADA reveals that the term 'qualified' refers to whether the individual [was] qualified at the time of the job action in question." *Morton v. GTE North Inc.,* 922 F.Supp. 1169, 1178 (N.D.Tex. 1996), *aff'd,* 114 F.3d 1182 (5th Cir.), *cert. denied,* 522 U.S. 880, 118 S.Ct. 205, 139 L.Ed.2d 141 (1997) (citing S. REP. No. 116, 101st Cong., 1st Sess. 26 (1989)).

 To meet the first requirement of a *prima facie* case, establishing that he has a disability within the purview of the ADA, Bennett must show that he has an impairment that is severe enough to limit substantially one or more major life activities. In his response, Bennett states "it is clear from Plaintiff's Response to Motion for Summary Judgment, and is repeated here, that Plaintiff *is not* claiming that he actually suffered from a disability (as that term is primarily defined by the ADA) at the time that he sought to return to work. (emphasis in original). Rather, the argument is made that he was either 'regarded as disabled' or had a 'record of disability' at the time that he sought to return to work in mid–2002." Nevertheless, in order to proceed, Bennett must show that his arterial occlusive disease substantially limited or was regarded as substantially limiting a major life activity.

Bennett offers no evidence that his condition substantially limits a major life activity, thereby rendering him disabled under the definition set forth in the ADA. Although Bennett alleges in his complaint that he is "a qualified individual with a disability, Arterialocdasive Disease [sic]," he does not claim that he suffers from a physical or mental impairment that substantially limits a major life activity. In fact, it is apparent from Bennett's own admissions and the record as a whole that Bennett is not and never was disabled within the meaning of the ADA. At deposition, Bennett testified:

Q. As you sit here today, do you believe that you suffer from any kind of mental, physical, or emotional disability?

A. No.

Q. Do you feel like you've fully recovered from whatever condition it was that Dr. Dr. Foley operated on you for?

A. Yes.

\* \* \* \* \* \*

Q. Do you feel like you were ever disabled after your surgeries from work?

A. No.

In addition, with respect to the disability claim, signed by Dr. Foley, stating that Bennett "should be on full disability due to his condition," Dr. Foley testified:

A. At the—On the dates that these were signed I would say that it was—he was capable of engaging in physical activity such that his employer required.

Q. Okay.

A. The—the concern was that he couldn't work the kind of hours such that he could maintain his health. And that was my concern.

\* \* \* \* \* \*

Q. Can you explain for the Jury how it is that your—the difference between the May 2nd letter—which essentially—says he should be able to perform the function of his job without restriction—and the release to work dated April 30th as compared to your prior concerns about lifestyle that we had talked about more in December, January time period?

A. Well, it was my belief that Mr. Bennett had received an excellent result following his—his last operation; that his physical condition was as good as it could get; that he had normal circulation restored to his legs; and, therefore, could engage in full physical activity, including vigorous activity. He could do lifting. He could do stair walking, whatever was required by his employer, with the exception that he still needed to exercise regularly and maintain a—a schedule such that he could maintain his health and fitness.

But if—if he could get on a schedule such that it would allow him to maintain his fitness, there was no reason why he couldn't be fully employed.

Finally, Dr. Foley elaborated on his note indicating that Bennett was fully disabled:

A. Well, Mr. Bennett was for a period of his life fully disabled because of his arterial occlusive disease. However, with the type of surgery that we were able to perform for him we changed his full disability into what was for a time a temporary disability; and then once he was fully recovered, to a condition where he had no disability.

And yes, he did have underlying atherosclerosis and occlusive disease; but that had been corrected with the use of our operation and was—he was, therefore—once fully recovered—no longer disabled in my opinion.

In discussing his January 22, 2002, letter, which states that Bennett should be on full disability due to his condition, Dr. Foley explained that his opinion regarding Bennett's disability was only for the dates listed, October 31, 2001, through November 26, 2001. At deposition, he testified:

Q. All right. Do you—believe that this claim form—Exhibit 7A—indicates anywhere on it that Mr. Bennett should be on full disability, total disability due to his condition?

A. For the inclusive dates for which this form addresses, yes.

Q. All right. Do you—Do you—Do you know why Mr. Bennett was filling out these claim forms? Did he ever indicate to you what he was filing—

A. I would assume that he was filling them out to get disability.

Dr. Foley further commented:

Q. Well, these—these forms may have been filled out on those dates; but they reflected as far as I'm concerned his—his disability from the date of 10/31 to 11/26.

 * * * * * *

Q. If—if in fact the evidence shows that Mr. Bennett went to the employer and told them that he could not work during that time frame after you released him to return to work and that he believed he should be on total disability during that time frame; it wasn't that—From January of 2002 to May of 2002 if Mr. Bennett represented to Amber McDonald and the people at Calabrian that he needed to be off on total disability during that time frame, were—were you aware of that or had you ever assisted him in—in that regard?

A. I would be somewhat surprised that Mr. Bennett would represent himself as totally disabled. However, he may have—And—and this is supposition on my part.

The record reflects that Bennett was, in the opinion of Dr. Foley, totally disabled from the date of his surgery, October 31, 2001, through November 26, 2001, at which time he was released to return to work.

While Bennett may have been physically impaired during this time period, " '[t]he EEOC regulations provide that temporary, non-chronic impairments of short duration, with little or no permanent long-term impact, are usually not disabilities.' " *Hamilton*, 136 F.3d at 1051 (quoting *Rogers*, 87 F.3d at 759). After his third surgery on October 31, 2001, Bennett fully recovered and was released to return to work without restrictions on November 26, 2001. Although he may have been unable to work during this short time period, the evidence demonstrates that he recovered fully and was no longer impaired as a result of his condition. Consequently, there is no evidence that Bennett ever suffered from an impairment that substantially limited a major life activity to as to render him disabled within the parameters of the ADA.

The evidence also fails to demonstrate that Bennett's condition prevented him from performing an entire class of jobs, or even a broad range of jobs. "While an individual need not be completely unable to work, one is not substantially limited in working if he or she is unable to perform a single job or a narrow range of jobs." *Blanks*, 310 F.3d at 401. Here, Bennett manifestly "retains the ability to compete successfully with similarly skilled individuals and no facts indicate that he is unable to perform a class of jobs nor a broad range of jobs." *Hamilton*, 136 F.3d at 1051; *see Mason*, 274 F.3d at 317; *Dupre*, 242 F.3d at 614–15; *Sherrod*, 132 F.3d at 1120. . Thus, while Bennett's condition may have caused him some difficulty, he has not shown that he has an impairment that substantially limits a major life activity, including the activity of working. *See Waldrip*, 325 F.3d at 655–57. Moreover, Bennett has not provided any medical records, reports, opinions, or documents that even suggest, let alone confirm, that his ability to work or function in any other capacity is substantially limited by his physical condition. *See id.; Blanks*, 310 F.3d at 401; *Adams v. Rochester Gen. Hosp.*, 977 F.Supp. 226, 232 (W.D.N.Y. 1997).

The only evidence provided indicates that Dr. Foley suggested Bennett change his shift schedule to allow for regular exercise and a general alteration in lifestyle to maintain proper health. According to Dr. Foley, Bennett "was capable of engaging in physical activity such that his employer required." Dr. Foley's primary concern "was that he couldn't work the kind of hours such that he could maintain his health." An employee, however, is not considered disabled under the ADA where his only impairment is the inability to do rotating shift work. *See Amos v. Wheelabrator Coal Servs., Inc.*, 47 F.Supp.2d 798, 803 (N.D.Tex.1998). There is no indication, therefore, that Bennett was, in any manner, substantially limited in performing his job. Consequently, Bennett has not shown that he was disabled within the purview of the ADA at the time of the alleged discriminatory act.

b. *Record of Impairment*

Likewise, Bennett has failed to produce evidence that he has a record of an impairment. *See* 42 U.S.C. § 12102(2)(B); *Sherrod*, 132 F.3d at 1120; *see also Pryor*, 138 F.3d at 1028; *Robinson v. Global Marine Drilling Co.*, 101 F.3d 35, 37 (5th Cir. 1996). "Although the ADA does not define 'record of impairment,' the regulations provide: 'Has a record of such impairment' means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more of the major life activities." *Sherrod*, 132 F.3d at 1120 (quoting 29 C.F.R. § 1630.2(k)); *see Dupre*, 242 F.3d at 615; *Ray,* 85 F.3d at 229 (holding that an inability to perform continuous, heavy lifting or an inability to perform a particu-

lar job does not necessarily constitute a record of disability). It is not enough for an ADA plaintiff simply to show that he has a record of an adverse medical diagnosis; "in order to establish the existence of a disability under § 12102(2)(B) there must be a record of an impairment that substantially limits one or more of the ADA plaintiff's major life activities." *R.J. Gallagher Co.*, 181 F.3d at 655; *see Dupre*, 242 F.3d at 615; *Burch*, 119 F.3d at 321–22 (citing 29 C.F.R. § 1630, App.).

■ Thus, in order to prevail on a claim for discrimination based on a record of an impairment, the plaintiff must show both that "(1) the plaintiff has a record or history of impairment; and (2) the impairment limits a major life activity." *Blanks*, 310 F.3d at 402 (citing *Dupre*, 242 F.3d at 615). "Although an individual may show that he or she has a record of impairment, if he or she fails to show that the impairment is substantially limiting, the individual may not qualify as disabled." *Id.* (holding that HIV-positive plaintiff did not qualify as disabled under this prong because he was unable to work only as a residential customer service representative but could work in other positions); *see Sherrod*, 132 F.3d at 1120–21 (finding that prior back surgery and disability leave of absence failed to show that impairment significantly limited a major life activity); *Rogers*, 87 F.3d at 759 (employee's 13% permanent, partial disability rating did not establish a record of an impairment in the absence of evidence connecting the impairment with an inability to perform numerous jobs or other of life's ordinary functions); *Dutcher*, 53 F.3d at 726–27 (refusing to find an employee disabled while noting that the "record of" an impairment must be of the type that substantially limits a major life activity). Although the evidence may demonstrate a record of an impairment from October 31, 2001, through November 26, 2001, it does not establish a record of a disability, where, as here, the impairment is not shown to have substantially limited a major life function. *See Blanks*, 310 F.3d at 402; *Robinson*, 101 F.3d at 37 (advising supervisor of asbestosis diagnosis and having condition noted in personnel file were evidence of history of an impairment but not of a disability because did not substantially limit a major life activity). Furthermore, a record of a medical diagnosis alone does not establish a substantially limiting impairment. *See R.J. Gallagher Co.*, 181 F.3d at 655.

■ Here, the mere fact that Bennett suffers from arterial occlusive disease and underwent three aortofemoral bypass surgeries does not establish a record of an impairment. *See Dupre*, 242 F.3d at 615 (citing *Sherrod*, 132 F.3d at 1120–21). Hence, having no disability cognizable under the ADA, Bennett has failed to adduce sufficient summary judgment evidence that he has a record of having an impairment that substantially limits a major life activity. *See Hamilton*, 136 F.3d at 1051.

c. *Regarded as Having Such Impairment*

■ Similarly, Bennett has not shown that he was regarded by others as having such an impairment, nor has he demonstrated that he was treated as having such an impairment. *See Deas*, 152 F.3d at 481–82; *Pryor*, 138 F.3d at 1028; *Sherrod*, 132 F.3d at 1121. Under the ADA:

[a]n individual is "regarded as" disabled when a covered entity mistakenly believes that: (1) a person has a physical impairment that substantially limits one or more major life activities; or (2) an actual, non-limiting impairment substantially limits one or more major life activities. In both situations, the covered entity must entertain some misperception regarding the individual—either that he has a substantially limiting im-

pairment that he does not have or the impairment is not so limiting as believed.

*Aldrup,* 274 F.3d at 287 (citing *Sutton,* 527 U.S. at 489, 119 S.Ct. 2139); *see Gowesky,* 321 F.3d at 508; *McInnis,* 207 F.3d at 281. "Under the 'regarded as' prong, the disability status of the plaintiff turns not on the plaintiff's physical condition, but rather on how the plaintiff was perceived and treated by those alleged to have taken discriminatory action." *Deas,* 152 F.3d at 476 n. 9; *see Mason,* 274 F.3d at 317; *Dupre,* 242 F.3d at 616 (citing *McInnis,* 207 F.3d at 281).

To make a *prima facie* showing of disability under this provision, the plaintiff must produce sufficient evidence for a reasonable trier of fact to conclude that the employer perceived him, however erroneously, as having an impairment that substantially limited one or more of his major life activities. *See Blanks,* 310 F.3d at 402; *Dupre,* 242 F.3d at 616; *Zenor,* 176 F.3d at 860; *Deas,* 152 F.3d at 476; *Pryor,* 138 F.3d at 1028; *Hamilton,* 136 F.3d at 1051; *Sherrod,* 132 F.3d at 1121. "For an employer to regard an impairment as substantially limiting work, the employer must regard an individual as significantly restricted in his ability to perform a class or broad range of jobs." *Hamilton,* 136 F.3d at 1051–52 (citing *Burch,* 119 F.3d at 322; *Bridges,* 92 F.3d at 332); *accord Blanks,* 310 F.3d at 402. " '[A]n employer does not necessarily regard an employee as having a substantially limiting impairment simply because it believes [he] is incapable of performing a particular job.' " *Pryor,* 138 F.3d at 1028 (quoting *Ellison v. Software Spectrum, Inc.,* 85 F.3d 187, 192 (5th Cir.1996)); *see Blanks,* 310 F.3d at 402; *Dupre,* 242 F.3d at 616 (citing *Deas,* 152 F.3d at 480). "An employer's belief that an employee is unable to perform one task with an adequate safety margin does not establish per se that the employer regards the employee as

having a substantial limitation on his ability to work in general." *Foreman v. Babcock & Wilcox Co.,* 117 F.3d 800, 807 n. 10 (5th Cir.1997) (citing *Chandler,* 2 F.3d at 1393); *see Deas,* 152 F.3d at 481 n. 22. Furthermore, if the employer's belief corresponds to the employee's or his physician's description of his limitations, the employer cannot be viewed as improperly regarding him as disabled. *See Byrne v. Board of Educ.,* 979 F.2d 560, 567 (7th Cir.1992) (refusing to find employer improperly treated plaintiff as disabled when employer regarded her as she defined herself); *Bernard v. Doskocil Cos., Inc.,* 861 F.Supp. 1006, 1013 n. 13 (D.Kan.1994) ("[a]lthough [the employer] apparently did, based on the work restrictions prescribed by [the plaintiff's physician], regard plaintiff as having a condition which prevented him from performing certain functions, prong (3) is intended to encompass those situations in which an employee regards someone as disabled based on certain stereotypes or myths, not a situation where a person is regarded as having limitations because a doctor has said so").

While it is undisputed that Bennett has a heart condition, his impairment did not substantially limit a major life activity and Calabrian did not regard him as having such an impairment. Here, Bennett remained employed by Calabrian after his three heart surgeries. He continued to have all of his previous job responsibilities and duties following those surgeries and retained his position after the third surgery until he applied for and received disability benefits and a medical leave of absence. While he was on medical leave and receiving disability benefits, Bennett submitted another release in May 2002, stating that he was able to return to work without restrictions. In light of the fact that Bennett was receiving total disability benefits, his request to return to work aroused the suspicions of Cogliandro, who

·requested that McDonald send him Bennett's personnel file. After reviewing the file, Cogliandro surmised that Bennett had never been disabled. As a consequence, Cogliandro asked Bennett to provide additional information to explain the vast disparities in his disability status in 2002. According to Cogliandro, the letters Bennett sent to Calabrian were not sufficient to explain the differences. Hence, Bennett was not reinstated, and his position at Calabrian was filled by another individual.

In this situation, Bennett was properly regarded as disabled when he submitted his request for disability benefits accompanied by a note from his physician stating that he should be on full disability. At the time Bennett filed his request, he informed Maneman that he was completely disabled. At deposition, Maneman testified:

A. I don't recall the date that he came back to work, to when he came into my office and said that he was totally disabled, was the first time that I knew anything about it.

 \* \* \* \* \* \*

Q. What was your understanding about the nature of his disability.

A. Was fully and total.

As a result of the note signed by Dr. Foley and submitted by Bennett in January 2002, Calabrian granted Bennett's request for total disability benefits. Although Calabrian may have considered him to be disabled at that juncture, such designation merely corresponded with Dr. Foley's description of Bennett's condition and his own self-assessment as expressed to Maneman, which "cannot be viewed as improperly regarding him as disabled." *Eber v. Harris County Hosp. Dist.*, 130 F.Supp.2d 847, 863 (S.D.Tex.2001); *accord Byrne*, 979 F.2d at 567; *Bernard*, 861 F.Supp. at 1013 n. 13. As Maneman testified at deposition:

A. My—my personal opinion was that he wasn't disabled. But I had a doctor's note that said he was fully disabled and I don't have a medical background.

Shortly thereafter, Bennett's request for medical leave was granted, as well. The fact that Calabrian allowed Bennett to take medical leave, however, does not establish that Calabrian improperly regarded Bennett as disabled. *See Linser v. State of Ohio, Dep't of Mental Health*, 234 F.3d 1268, No. 99–3887, 2000 WL 1529809, at \*4 (6th Cir. Oct.6, 2000) (citing *Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595, 599 (8th Cir.1998)). Cogliandro testified that when Bennett submitted another release stating he was no longer disabled, he thought Bennett was "playing games" with the company to obtain benefits and that he was never disabled. According to Cogliandro:

Q. All right. Moving back forward again. May 2002, Ms. McDonald contacts you to tell you essentially that Mr. Bennett has submitted a release from a doctor saying that he is no longer disabled, able to come to work, essentially. I'm not trying to quote those very words of her. But what was your reaction in response to her call?

A. Given the nature of the previous conversations, I was already—how do I want to say this—suspicious about the claims that had been filed previously, regarding disability. When I got the call from Amber, now I really became suspicious. Because I didn't believe that Mr. Bennett was disabled and unable to perform the duties of his job. Basically unable to perform his job.

 \* \* \* \* \* \*

Q. Will you tell me, please, what other information other than him not having arterial occlusive disease were you looking for?

A. I wanted to know exactly what had changed. Okay. Because I believed that games were being played and that these benefits had been a—had been basically paid and shouldn't have been paid. That was my belief. Okay. And my intent was in writing to you and to the EEOC and to the variety of other people that I wrote to, to try to get to the bottom of basically what was going on. That was my intent. And no matter how I wrote it or what I said, my intent was to try to come to some understanding as to what was going on because I didn't believe what I was being told.

Bennett has offered no evidence indicating that Calabrian or its agents regarded Bennett as being limited by his condition at the time the alleged discriminatory action occurred. Indeed, Bennett conceded at deposition that no one at Calabrian regarded him as disabled and unable to work:

Q. Did anyone at Calabrian, before this happened in whatever, late 2002, whenever it happened in 2002, before you were not hired back, did anyone at Calabrian ever tell you that they thought that because of your arterial artery disease, you were somehow disabled or unable to work?

A. No.

Rather, Calabrian regarded him as deceitful, not as disabled.

Therefore, because Bennett has not shown that he suffers from an impairment that substantially limits a major life activity, has a record of such an impairment, or was treated as having a substantially limiting impairment, he has failed to establish that he is or was disabled within the purview of the ADA. Hence, Bennett is unable to present a *prima facie* case of disability discrimination.

3. *Reasonable Accommodation*

Even if Bennett had demonstrated that he has a disability that substantially limits a major life activity, he has not shown that he is a qualified individual with a disability because he has failed to demonstrate that Calabrian could have reasonably accommodated his job restrictions. Bennett contends that "Calabrian refused to accommodate [his] request that he be put on straight shifts." Specifically, he maintains that his request was "entirely consistent with the opinions of his doctors that he provided to Calabrian, neither of which suggest any requirement that he be put only on straight days or straight nights, only that he not be put on a *rotating* shift." (emphasis in original).

The ADA provides:

The term "Reasonable Accommodation" may include—

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9); *see Allen*, 204 F.3d at 622. In addition to repeating the examples set forth in the statute, the regulations define the term "reasonable accommodation" as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(*o*)(1)(ii); *see U.S. Airways, Inc. v. Barnett,* 535

U.S. 391, 417, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002); *Bruff v. North Miss. Health Servs., Inc.,* 244 F.3d 495, 500 (5th Cir.), *cert. denied,* 534 U.S. 952, 122 S.Ct. 348, 151 L.Ed.2d 263 (2001); *Burch,* 119 F.3d at 314. In a recent decision, the United States Supreme Court recognized that:

> the [ADA] requires preferences in the form of "reasonable accommodations" that are needed for those with disabilities to obtain the *same* workplace opportunities that those without disabilities automatically enjoy. By definition any special "accommodation" requires the employer to treat an employee with a disability differently, *i.e.,* preferentially.

*US Airways, Inc.,* 535 U.S. at 397, 122 S.Ct. 1516 (emphasis in original).

 The plaintiff is required to demonstrate, as part of his *prima facie* case, that an accommodation of his disability exists and that such accommodation is reasonable. *See Riel v. Electronic Data Sys. Corp.,* 99 F.3d 678, 683 (5th Cir.1996); *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1286 (11th Cir.1997) (citing *Willis v. Conopco, Inc.,* 108 F.3d 282, 285 (11th Cir.1997)). "[A] reasonable accommodation is 'a method of accommodation that is reasonable in the run of cases, whereas the undue hardship inquiry focuses on the hardships imposed by the plaintiff's preferred accommodation in the context of the particular [employer's] operations.'" *Riel,* 99 F.3d at 683 (quoting *Barth v. Gelb,* 2 F.3d 1180, 1187 (D.C.Cir.1993), *cert. denied,* 511 U.S. 1030, 114 S.Ct. 1538, 128 L.Ed.2d 190 (1994) (interpreting "reasonable accommodation" under the Rehabilitation Act)); *see also U.S. Airways, Inc.,* 535 U.S. at 401, 122 S.Ct. 1516 (noting that many lower courts have held that an accommodation must be reasonable "on its face, *i.e.,* ordinarily or in the run of cases"). The burden of production is not a heavy one and merely entails demonstrating the existence of a plausible accommodation, "the costs of which, facially, do not clearly exceed its benefits." *Borkowski v. Valley Cent. Sch. Dist.,* 63 F.3d 131, 138 (2d Cir.1995); *see Bruff,* 244 F.3d at 500.

 Once the plaintiff has done so, the defendant has the burden of showing that the proposed accommodation is unreasonable, which "merges, in effect, with its burden of showing, as an affirmative defense, that the proposed accommodation would cause it to suffer an undue hardship." *Borkowski,* 63 F.3d at 138; *see Riel,* 99 F.3d at 681–82. The ADA provides "that an employer who fails to make 'reasonable accommodations to the known physical or mental limitations of an [employee] with a disability' discriminates '*unless*' the employer 'can demonstrate that the accommodation would impose an *undue hardship* on the operation of [its] business.'" *US Airways, Inc.,* 535 U.S. at 395, 122 S.Ct. 1516 (emphasis in original) (quoting 42 U.S.C. § 12112(b)(5)(A)); *see Williams,* 534 U.S. at 193, 122 S.Ct. 681. In practice, the questions of whether an accommodation is reasonable and whether it creates an undue burden are almost identical. *See, e.g., U.S. Airways, Inc.,* 535 U.S. at 402, 122 S.Ct. 1516 (noting that ordinary summary judgment principles reconcile reasonable accommodation and undue hardship); *Arline,* 480 U.S. at 287 n. 17, 107 S.Ct. 1123 (finding that accommodation is not reasonable if it either imposes "undue financial and administrative burdens" or requires a "fundamental alteration in the nature of [the] program"); *Bruff,* 244 F.3d at 500 (undue hardship exists if employer "incurs anything more than a *de minimis* cost"); *Riel,* 99 F.3d at 681 (the terms "reasonable accommodation" and "undue hardship" often go hand-in-hand); *Hall v. United States Postal Serv.,* 857 F.2d 1073, 1080 (6th Cir.1988)

(an accommodation is not reasonable if it places an undue burden on the employer).

Generally, " 'it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed.' " *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir.), *cert. denied*, 519 U.S. 1029, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996) (quoting 29 C.F.R. § 1630.9, App.); *see Allen*, 204 F.3d at 622; *Burch*, 119 F.3d at 314, 318. As the Fifth Circuit explained in *Taylor:*

> Once such a request has been made, "[t]he appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability." In other words, once an accommodation is properly requested, the responsibility for fashioning a reasonable accommodation is shared between the employee and employer. Thus, it is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one. If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one.

93 F.3d at 165 (quoting 29 C.F.R. § 1630.9, App.); *see Allen*, 204 F.3d at 622.

■■■■■ The ADA, however, does not require an employer to transfer any of the essential functions of a disabled employee's job in order to make reasonable accommodation for his disability. *See Barber v. Nabors Drilling, U.S.A., Inc.*, 130 F.3d 702, 709 (5th Cir.1997). In addition, where an employer has no part-time positions, the employer need not create such a position to accommodate a disabled employee; nor must it displace a temporary worker to place a disabled worker. *See Dalton v. Subaru–Isuzu Auto., Inc.*, 141 F.3d 667, 680 (7th Cir.1998); *Terrell v. USAir*, 132 F.3d 621, 626 (11th Cir.1998); *Burch*, 119

F.3d at 318 n. 11. Similarly, an employer has no obligation to create a new "light duty" position for a disabled employee. *See Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir.1996); *Steffes v. Stepan Co.*, 144 F.3d 1070, 1073 (7th Cir. 1998); *Foreman*, 117 F.3d at 809; *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1187 (6th Cir.1996). Furthermore, an employer is not obligated to implement "an accommodation that would result in other employees having to work harder or longer." *Turco*, 101 F.3d at 1094; *see Kralik v. Durbin*, 130 F.3d 76, 79 (3d Cir.1997); *Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir.1995), *cert. denied*, 516 U.S. 1172, 116 S.Ct. 1263, 134 L.Ed.2d 211 (1996); *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir.1995). Hence, the ADA does not require an employer to promote a disabled employee as an accommodation, reassign the employee to an occupied position, create a new position, eliminate essential functions of a job, or assign existing employees or hire new employees to perform abandoned essential functions of a position. *See Still*, 120 F.3d at 53; *Turco*, 101 F.3d at 1094; *Gile v. United Airlines, Inc.*, 95 F.3d 492, 498 (7th Cir.1996); *White v. York Int'l Corp.*, 45 F.3d 357, 362 (10th Cir.1995); *Chiari v. City of League City*, 920 F.2d 311, 318 (5th Cir.1991); *see also* 29 C.F.R. pt. 1630, App. § 1630.2(*o*).

■■■■ Additionally, an employer is not obligated to allow a disabled employee to take an indefinite leave for purposes of accommodation. *See Burch*, 119 F.3d at 318 n. 11; *Hudson v. MCI Telecomms. Corp.*, 87 F.3d 1167, 1169 (10th Cir.1996); *Rogers*, 87 F.3d at 759–60; *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir.1995). " '[R]easonable accommodation does not require [an employer] to wait indefinitely for [an employee's] medical conditions to be corrected.' " *Rogers*, 87 F.3d at 760 (empha-

sis in original) (quoting *Myers,* 50 F.3d at 283). In essence, "[t]he law does not require affirmative action in favor of individuals with disabilities. It merely prohibits employment discrimination against qualified individuals with disabilities, no more and no less." *Turco,* 101 F.3d at 1094 (citing *Daugherty,* 56 F.3d at 700); *accord Foreman,* 117 F.3d at 810.

In the case at bar, Bennett alleges that Calabrian "refused to accommodate Bennett's request that he be put on straight shifts." Bennett asserts that he offered to work either straight days or straight nights in accordance with his doctor's recommendations. According to Calabrian, in Bennett's job, "everyone rotates through the schedule ... no one person ha[s] a monopoly on a shift." There is no requirement that Calabrian create a new job just for Bennett or transfer him to a non-rotating shift position when the evidence clearly indicates that no such positions were available. *See Turco,* 101 F.3d at 1094; *Amos,* 47 F.Supp.2d at 803. Furthermore, Dr. Foley's opinion that Bennett's alleged impairment would benefit from a non-rotating shift is insufficient to recover under the ADA. *See id.*

Finally, "an employer need not provide reasonable accommodation to an employee who does not suffer from a substantially limiting impairment merely because the employer thinks the employee has such an impairment." *Newberry v. East Tex. State Univ.,* 161 F.3d 276, 280 (5th Cir.1998). In other words, "the duty to make a reasonable accommodation arises only when the individual is disabled; no such duty arises when the individual merely is 'regarded as' being disabled as defined under the ADA." *Cannizzaro v. Neiman Marcus, Inc.,* 979 F.Supp. 465, 475 (N.D.Tex.1997). Therefore, to the extent Bennett argues that he was not disabled but Calabrian regarded him as such, Bennett was not entitled to a reasonable accommodation. *See id.* As a consequence, Bennett has not satisfied the second element of a *prima facie* case of disability discrimination.

### 4. *Retaliation under the ADA*

Bennett also alleges that Calabrian retaliated against him by telling him that he "could not work because of his medical condition and a release was not good enough unless it stated the medical condition disappeared." The ADA prohibits discrimination against an employee who has engaged in activity protected by the Act:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a). "Retaliation claims are treated the same whether brought under the ADA or Title VII." *Penny v. United Parcel Serv.,* 128 F.3d 408, 417 (6th Cir.1997); *see Talanda v. KFC Nat'l Mgmt. Co.,* 140 F.3d 1090, 1095–96 (7th Cir.), *cert. denied,* 525 U.S. 869, 119 S.Ct. 164, 142 L.Ed.2d 134 (1998); *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 511 (7th Cir.1998); *Sherrod,* 132 F.3d at 1122; *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir.1997); *Stewart,* 117 F.3d at 1287; *Soileau v. Guilford of Me., Inc.,* 105 F.3d 12, 16 (1st Cir.1997).

To establish a *prima facie* case of retaliation under the ADA, the plaintiff must show:

(1) he engaged in statutorily protected activity;

(2) an adverse employment action occurred; and

(3) a causal connection exists between the protected activity and the adverse employment action.

See *Aldrup,* 274 F.3d at 286; *Seaman,* 179 F.3d at 301; *Talanda,* 140 F.3d at 1095; *Champagne v. Servistar Corp.,* 138 F.3d 7, 12 n. 5 (1st Cir.1998); *Sherrod,* 132 F.3d at 1122 n. 8; *Penny,* 128 F.3d at 417; *Krouse,* 126 F.3d at 500.

The plaintiff bears the initial burden of establishing a *prima facie* case of retaliation. *See Seaman,* 179 F.3d at 301; *Davidson,* 133 F.3d at 511. If the employee establishes a *prima facie* case of retaliation under the ADA, the burden shifts to the employer to advance a legitimate, nonretaliatory reason for its adverse employment action. *See Aldrup,* 274 F.3d at 286; *Seaman,* 179 F.3d at 301; *Krouse,* 126 F.3d at 500. "If such a reason is advanced, the plaintiff must adduce sufficient evidence that the proffered reason is a pretext for retaliation." *Seaman,* 179 F.3d at 301; *see Talanda,* 140 F.3d at 1096; *Sherrod,* 132 F.3d at 1123; *Penny,* 128 F.3d at 417. "The ultimate issue of retaliation requires the employee to prove that the adverse employment action would not have occurred 'but-for' the protected activity." *Sherrod,* 132 F.3d at 1122; *accord Seaman,* 179 F.3d at 301.

Although Bennett alleges retaliation in his complaint, he does not address this claim in his response to the summary judgment motion and appears to have abandoned it. *See Scales v. Slater,* 181 F.3d 703, 709 n. 5 (5th Cir.1999); *Yohey v. Collins,* 985 F.2d 222, 224–25 (5th Cir. 1993); *Riggan v. Midland Indep. Sch. Dist.,* 86 F.Supp.2d 647, 659 (W.D.Tex. 2000); *see also Friou v. Phillips Petroleum Co.,* 948 F.2d 972, 974 (5th Cir.1991); *Davis v. Cannon,* 91 Fed.Appx. 327, 329, No. 02–41596, 2004 WL 362233, at *1 (5th Cir. Feb.26, 2004); *Toro v. Ashcroft,* 83 Fed.Appx. 15, 17, No. 03–60107, 2003 WL 22880763, at *2 (5th Cir. Dec.5, 2003).

## C. *Civil Rights Act of 1991*

The Civil Rights Act of 1991, 42 U.S.C. § 1981a, provides a prevailing plaintiff in an intentional employment discrimination case the ability to recover compensatory and punitive damages from the defendant. *See* 42 U.S.C. § 1981a(a); *Huckabay v. Moore,* 142 F.3d 233, 241 (1998). It applies not only to actions brought under Title VII of the Civil Rights Act of 1964, but also to actions brought under the ADA and the Rehabilitation Act. *See* 42 U.S.C. § 1981a(a)(2). This statute does not create a new substantive right or an independent cause of action; rather, it "enhances the remedies otherwise available for intentional employment discrimination." *Perry v. Dallas Indep. Sch. Dist.,* No. CIV. A. 3:96–CV–2855, 1998 WL 614668, at *1 n. 1 (N.D.Tex. Sept.2, 1998); *see Huckabay,* 142 F.3d at 241; *Presutti v. Felton Brush, Inc.,* 927 F.Supp. 545, 550 (D.N.H.1995); *Swartzbaugh v. State Farm Ins. Cos.,* 924 F.Supp. 932, 934 (E.D.Mo. 1995).

"Implicit in § 1981a is the requisite that an action will not exist under the Civil Rights Act absent a primary claim under another substantive act." *Presutti,* 927 F.Supp. at 550 (citing *West v. Boeing Co.,* 851 F.Supp. 395, 401 (D.Kan. 1994)). In short, "[t]here is no such thing" as a § 1981a claim. *Perry,* 1998 WL 614668, at *1; *accord Gates v. City of Dallas,* No. CIV. A. 3:96–CV–2198–D, 1998 WL 133004, at *7 (N.D.Tex. Mar.18, 1998). As this provision merely provides remedies additional to those already available, it applies only if the plaintiff otherwise establishes intentional discrimination on the part of the employer under another substantive act. *See Huckabay,* 142 F.3d at 241; *Presutti,* 927 F.Supp. at 550. In this instance, because Bennett's claims under the ADA lack merit, he, likewise, has no right to relief under § 1981a. *See Perry,*

1998 WL 614668, at *1; *Presutti,* 927 F.Supp. at 550–51; *Swartzbaugh,* 924 F.Supp. at 934.

### III. *Conclusion*

In summary, Bennett has not adduced sufficient evidence to defeat Calabrian's motion for summary judgment. There are no outstanding issues of material fact, as Bennett has failed to show that he has a disability cognizable under the ADA, that he has a record of such an impairment, or that he was regarded as disabled in violation of the ADA. Accordingly, Calabrian's motion for summary judgment as to Bennett's affirmative claims is GRANTED. Bennett has failed to present a claim that would entitle him to relief, and Calabrian is entitled to judgment as a matter of law. The counterclaim asserted by Calabrian against Bennett remains pending.

IT IS SO ORDERED.

### ORDER GRANTING SUMMARY JUDGMENT ON LARRY BENNETT'S CLAIMS AGAINST CALABRIAN CHEMICALS CORPORATION

In accordance with the court's Memorandum and Order signed June 8, 2004, the Court renders summary judgment in favor of Defendant Calabrian Corporation with respect to Larry Bennett's claims against it.