Dawn CATO, Plaintiff,

v.

FIRST FEDERAL COMMUNITY
BANK, Defendant.

Civil Action No. 4:08–CV–281.

United States District Court,
E.D. Texas,
Sherman Division.

Nov. 5, 2009.

Alex Arthur Castetter, Stuckey Garrigan & Castetter, Nacogdoches, TX, for Plaintiff.

Stephen Cass Weiland, Robert Allen Hawkins, Patton Boggs, Dallas, TX, for Defendant.

### *MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

RICHARD A. SCHELL, District Judge.

Before the court are Defendant's "Motion for Summary Judgment and Brief in Support" (Dkt. 22), Plaintiff's "Response in Opposition to Defendant's Motion for Summary Judgment" (Dkt. 24), and Defendant's "Reply Brief in Support of Motion for Summary Judgment" (Dkt. 25). For the reasons set out below, Defendant's motion is **GRANTED** in its entirety.

## I. BACKGROUND

This is an employment discrimination case brought under the Americans with Disabilities Act ("ADA"). Plaintiff claims Defendant discriminated against her in violation of the Act because it failed to promote her, did not provide reasonable accommodation for her disability, and discharged her in retaliation for seeking relief with the EEOC. Defendant First Federal Community Bank ("the Bank") is a financial institution located in Paris, Texas. Plaintiff Dawn Cato ("Cato") is a 48 year old female who was employed by the Bank from September 1998 to January 2008.

Cato was diagnosed with lupus in 2002 and also suffers from asthma and multiple arthralgias. These conditions did not affect Cato's employment at the Bank until June 2004, when Cato advised the Bank's President, Dick Amis, that she had been diagnosed with lupus in 2002. Cato sought permission to use a handicapped parking space in the Bank's parking lot and requested a key to an entry located on the same side of the building as her office. The Bank agreed to Cato's requests and she was permitted to use the parking space and enter through the building's side entrance. Cato Dep. at 58–60.

Cato's health problems did not affect her work again until May 2006, when she underwent neck surgery and remained off work on medical leave until approximately July 10, 2006. While Cato was absent, another Bank employee, Rebecca Smyers, assumed responsibility for Cato's work.

Shortly after Cato's medical leave began, Smyers notified the department supervisor, Jeff Wright, that certain vendor and other critical information, which she needed for processing accounts payable and payroll, was missing from the computer network drive. Farmer Aff. ¶ 4. After an investigation by the Bank's IT staff, supervisors concluded that Cato had intentionally deleted this information to hinder Smyers' work while she was away. On July 10, 2006, when Cato returned from medical leave she was confronted by Bank management about the incident. Farmer Aff. ¶ 7. Although Cato admits to deleting the information, she claims she had good intentions and had only hoped to ensure that Smyers did her job properly while she was away. Cato denies she deleted the information out of malice or ill-will and maintains that her actions did not prevent Smyers from completing her work. Cato Dep. at 113–14. Whatever the actual reasons for Cato's actions, the Bank determined that this incident combined with reports in Cato's annual performance evaluation of personality conflicts with coworkers in the accounting department necessitated a change. Shortly after the July 10, 2006 meeting, Cato was offered a position in the Bank's newly created Imaging Department. Although Cato was the only employee in the Imaging Department, the move was not a promotion: her salary remained the same and she reported to Joe Farmer. Farmer Aff. ¶ 7. Cato's new office was in the Bank's basement.

In approximately August 2006, Cato complained that mold and/or mildew caused by a water leak in her basement-office aggravated her allergies. As part of an ongoing remodeling project, the Bank repaired the water leak and converted the basement area into an office with three cubicles. This work was reportedly completed in December 2006 or January 2007, however, there is some debate as to whether the remodeling corrected the mold and/or mildew problem. Cato admits she cannot confirm that mold or mildew remained in the area after the renovations were complete, but she assumes the problem persisted because she continued to "have problems." Cato Dep. at 66. Despite Plaintiff's continued "problems," the summary judgment evidence before the court does not indicate that Plaintiff requested any accommodation related to the mold and/or mildew problem.

The events at the center of this law suit occurred on September 5, 2007. That day Cato met with Bank supervisors to discuss her performance and the future of the Imaging Department. The Bank's management complimented Cato on her work in the Imaging Department, but informed her that another Bank employee, Julie Peterson, would be moving into the department as its supervisor. This news was extremely distressing to Cato who felt she was the most qualified Bank employee to head the Imaging Department. In her deposition Cato explained:

> I was pulled into a meeting and praised for a good job, that there was no way they could do it without my help, that with my knowledge and expertise, it made it go pretty smooth. We still had a few bumps to work out. So in order to smooth that out, they were going to reorganize the department. They were going to-Julie would be heading up the department as supervisor.

> And it was like I was built up to this big euphoria, that I did a great job, and then all of a sudden I felt like I was kicked in the stomach by an elephant.

Cato Dep. at 78. That meeting was Cato's last with Bank managers. She left the office that day "a basket case" and never returned. Cato Dep. at 79. Following Cato's emotional departure from the Bank her health rapidly declined. According to notes from her doctors dated September

12 and 20, 2007, she suffered a lupus flare and an acute exacerbation of her arthralgias. *See* Pl.'s Ex. 7–9. Cato was placed on paid leave during this period.

On October 12, 2007, Cato filed her charge of discrimination with the EEOC alleging that she was the victim of discrimination based on disability. Pl.'s Ex. 6. On October 15, 2007, the Bank's human resources supervisor contacted Cato to discuss her work status. Cato stated there was "no way" she could return to work at that time and asked about FMLA and forms for applying for disability benefits. Byrum Aff. ¶ 14. Byrum supplied Cato with these forms and informed her that her six weeks of paid leave would expire November 5, 2007. Cato did not return to work at any time in October or November. On November 23, 2007, the Bank sent Cato a letter which asked Cato to state her intentions regarding her return to work and advised that if she did not return on or before December 3, 2007, the Bank would assume she had decided to terminate her position and she would be dropped from the pay roll. *Id.* at ¶ 15. Cato responded to this letter on November 28, 2007, stating that she did not want to terminate her employment, that she wanted to take long-term disability, and that she believed she was entitled to twelve weeks of paid medical leave through December 19, 2007. In a letter dated November 30, 2007, the Bank agreed to extend Cato's leave for an additional two weeks, but advised that if she did not return to work on or before December 17, 2007, she would be terminated. *Id.* at ¶ 17. Cato never returned to work and informed Byrum that she could not return to work because her illness was worse than it had ever been. *Id.* at ¶ 18. Cato's employment with the Bank was terminated on December 17, 2007. *Id.* On approximately January 10, 2008 Cato was removed from the Bank's rolls. *Id.* at ¶ 19.

## II. LEGAL STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The purpose of this rule is to isolate and dispose of factually unsupported claims or defenses. *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548. The mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, by its very terms, Rule 56(c) requires that there be "no *genuine* issue of *material* fact." *Id.* at 248, 106 S.Ct. 2505. Materiality is a question of substantive law; therefore "[o]nly disputes over facts that affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment has the initial burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986). If the nonmovant bears the burden of proof, however, the movant may discharge its burden simply by showing that there is an absence of

evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 323, 325, 106 S.Ct. 2548; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir.2000). Once the movant has carried its burden, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In order to create a genuine issue, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In ruling on a motion for summary judgment, the court must not weigh the evidence and determine the truth of the matter. The only inquiry necessary "is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. In making this determination, all doubts must be resolved in favor of the nonmoving party and any reasonable inferences are to be drawn in favor of that party. *Evans v. City of Bishop*, 238 F.3d 586, 589 (5th Cir.2000).

## III. DISCUSSION & ANALYSIS

The ADA prohibits employment discrimination against a qualified individual with a disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[1] Under the ADA, unlawful discrimination includes "not mak-

ing reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. 12112(b)(5)(A). The Act also protects employees who seek relief under its provisions from retaliatory discharge. *See* 42 U.S.C. 12203(a). Therefore, the ADA prohibits an employer from "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by this chapter...." *Id.*

In the case *sub judice*, Plaintiff alleges Defendant has engaged in both unlawful discrimination and retaliatory discharge. In its motion for summary judgment, Defendant avers Plaintiff failed to present a genuine issue of material fact as to her claims for discrimination and retaliatory discharge. The court will consider the legal standard for each claim and the relevant summary judgment evidence in turn.

### A. UNLAWFUL DISCRIMINATION

In the Fifth Circuit, a *prima facie* case of intentional discrimination may be established by either direct or circumstantial evidence. *Burch v. Coca–Cola Co.*, 119 F.3d 305, 320 (5th Cir.1997). To establish a *prima facie* case by direct evidence a plaintiff must show: (1) that she has a disability; (2) that she was qualified for the job; and (3) that she was subject to an adverse employment decision because of her disability. *Ivy v. Jones*, 192 F.3d 514, 516 (5th Cir.1999). In the absence of direct evidence, a plaintiff may use the *McDonnell Douglas* burden-shifting analy-

---

1. Congress recently enacted the ADA Amendments Act of 2008, Pub.L. No. 110–325, 122 Stat. 3553 (2008). Although these amendments took effect January 1, 2009, the changes were not intended to apply retroac-

tively. *See EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 469 n. 8 (2009). As a result, the court will not discuss or apply the amendments in the present analysis.

sis to establish discrimination. *EEOC v. Chevron Phillips Chem. Co., LP,* 570 F.3d 606, 615 (5th Cir.2009). Under that approach, the plaintiff must first prove each element of a *prima facie* case by establishing: (1) she is disabled or regarded as disabled; (2) she is qualified for the job; (3) she was subjected to an adverse employment action on account of her disability; and (4) she was replaced by or treated less favorably than non-disabled employees. *McInnis v. Alamo Comm. Coll. Dist.,* 207 F.3d 276, 279–80 (5th Cir.2000). Once a *prima facie* showing is made, the burden shifts to the defendant-employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 280. If such a reason exists, the burden shifts back to the plaintiff to establish by a preponderance of the evidence that the articulated reason was merely a pretext for unlawful discrimination. *Id.*

Whether discrimination is proved by direct or circumstantial evidence, the threshold element of any ADA claim is that the plaintiff have a disability within the meaning of the ADA. *Waldrip v. General Elec. Co.,* 325 F.3d 652, 654 (5th Cir.2003). "Failure to establish an actual or perceived disability is thus fatal to a plaintiff's case." *McInnis,* 207 F.3d at 279–80. The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." § 12111(8). A "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." § 12102(2). The relevant time for assessing the existence of a disability is the time of the adverse employment action. *Chevron,* 570 F.3d at 618.

## 1. Failure to Promote

Plaintiff alleges Defendant discriminated against her by promoting another Bank employee to supervisor of the Imaging Department. In its motion for summary judgment, Defendant argues Plaintiff was not disabled and therefore not entitled to the protections of the ADA. Plaintiff contends that she was disabled or in the alternative that she was regarded as disabled when the decision not to promote was made. With respect to Plaintiff's failure to promote claim, the relevant time period for assessing her disability is September 5, 2007, the date she was passed over for a promotion to the supervisor position in the imaging department.

### a. Did Plaintiff suffer from an actual disability on or before September 5, 2007?

To prove the existence of an actual disability under § 12102(2)(A), a plaintiff must first prove that she had a physical or mental impairment at the time of the adverse employment action. *Id.* Under EEOC regulations, "physical impairment" is defined as "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic, skin; and endocrine." *Id.* (quoting 29 C.F.R. § 1630.2(h)(1)). The existence of an impairment alone, however, does not make an individual disabled for the purposes of the ADA; a plaintiff must also establish that the impairment substantially limits a major life activity. *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 195, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). According to EEOC regulations, "major life activities" include functions such as

"caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). "Substantially limits" is defined as: "(i) [u]nable to perform a major life activity that the average person in the general population can perform; or (ii)[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to ... the average person in the general population." *Id.* at § 1630.2(j)(1). When determining whether an individual is substantially limited in a major life activity courts will consider: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact of or resulting from the impairment. *Chevron,* 570 F.3d at 615; *see also* 29 C.F.R. § 1630.2(j)(2). In general, "[t]he effects of an impairment must be severe to qualify as a disability under the ADA." *Waldrip,* 325 F.3d at 655. However, the ADA does not require that the impairment be completely disabling, and "the definition is met even if the difficulties are not insurmountable." *Chevron,* 570 F.3d at 619 (*quoting Bragdon v. Abbott,* 524 U.S. 624, 641, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)).

■ Plaintiff suffers from lupus which makes it difficult for her to walk, write or type. Plaintiff also asserts that her condition makes it difficult for her to sit or stand for long periods of time. In addition, Plaintiff suffers from asthma and multiple arthralgias. "Lupus is primarily a disease of the connective tissues, manifesting itself by way of skin lesions, arthritis, and joint pains. The disease may present symptoms of fatigue, fevers, and weakness." *Garrett v. Autozone, Inc.,* 71 F.Supp.2d 617, 619 (E.D.Tex.1999). Although the Fifth Circuit has never explicitly defined lupus as a "physical impairment" within the meaning of the ADA, the symptoms presented by the condition fit squarely within the definition adopted by EEOC regulations. Similarly asthma and multiple arthralgias may be considered "impairments" under the ADA. Defendant essentially concedes this point by failing to argue otherwise. There is also no dispute that the activities Plaintiff claims were impaired—walking, writing and typing (essentially "manual tasks" or "working"), standing, and sitting—constitute "major life activities" under the ADA. *See* 29 C.F.R. § 1630.2(i) (the non-exhaustive list of major life activities includes: "performing manual tasks, walking, ... and working"). The issue, therefore, is whether Cato's conditions "substantially impaired" her ability to perform these activities at the time she was not promoted.

Although Cato was diagnosed with lupus sometime in 2002, she puts forth no evidence to support her contention that lupus or any other impairment *substantially* limited a major life activity prior to September 5, 2007, when she was passed over for a promotion in the Imaging Department. At best, Cato can point to what she describes as "trouble," problems with her feet and hands swelling, and an excused medical leave following neck surgery. Cato Dep. at 16–17. According to coworker Charlotte Chancler, Cato "got around, but at times her joints were extremely swollen ..." and asthma caused her to "gasp for air sometimes." Chancler Dep. at 32. Despite these setbacks, Plaintiff admits she was able to go to work everyday, to work 40 hours a week, and sometimes work overtime. Cato Dep. at 16. Although it is conceivable that the effects of lupus could be debilitating, nothing in the evidence before the court indicates that Cato was "substantially limited" from performing the major life activities of walking, standing, performing manual tasks or working.

■ The fact that Cato was able to perform her job is not dispositive in determining whether her impairments constitute "substantial limitations." As the Fifth Circuit has noted,

> [c]onsidering plaintiffs' abilities to perform their jobs as evidence weighing against finding that they are disabled under the ADA would create an impossible catch–22 for plaintiffs: if their disabilities prevented them from doing their jobs altogether they would not be qualified individuals for the job under the ADA, and if they were able to work through their disabilities they would then not be considered disabled.

*Chevron,* 570 F.3d at 619. The focus of this court's inquiry, therefore, is what a plaintiff confronts, not overcomes. *See Emory v. AstraZeneca Pharm., LP,* 401 F.3d 174, 181 (3d Cir.2005). Here Cato's evidence that she underwent neck surgery, experienced joint swelling, and that her asthma made it difficult to breath is not sufficient to suggest that she confronted impairments which substantially limited her ability to perform major life activities. Indeed, the Fifth Circuit has declined to recognize individuals as disabled under similar circumstances when the effects of an impairment, even some serious ones, do not rise to the *substantial* limit. *See, e.g., Dupre v. Charter Behavioral Health Sys., Inc.,* 242 F.3d 610, 614 (5th Cir.2001) (holding back injury not a substantial limit on major life activities of sitting, standing or working); *Talk v. Delta Airlines, Inc.,* 165 F.3d 1021, 1025 (5th Cir.1999) (holding "moderate difficulty experienced while walking does not rise to the level of a disability"); *Robinson v. Global Marine Drilling Co.,* 101 F.3d 35, 37 (5th Cir.1996) (holding asbestosis not a substantial limit on the major life activity of breathing).

Additionally, although many courts have recognized that relapsing-remitting conditions can constitute ADA disabilities, *Chevron,* 570 F.3d at 618, Cato has not produced evidence of past "flare ups" to indicate that her impairments constitute such a disability. With respect to her medical history, Cato states only "the first time I got lupus, it just affected me for a few months...." Cato Dep. at 18. Although the court accepts this statement as true, Cato has not produced any evidence to show how her past "flare ups" substantially limited a major life activity. In short, there is insufficient evidence to create a fact issue as to whether Cato's impairments were a disability that substantially limited a major life activity prior to or on September 5, 2009.

*b. Was Plaintiff "regarded as" disabled prior to or on September 5, 2007?*

■ Plaintiff argues that even if she was not actually disabled at the time she was denied the promotion, employees and bank managers regarded her as disabled. An individual is regarded as having a substantially limiting impairment if the individual: "(1) has an impairment that is not substantially limiting but which the employer perceives as substantially limiting, (2) has an impairment that is substantially limiting only because of the attitudes of others, or (3) has no impairment but is perceived by the employer as having a substantially limiting impairment." *Waldrip,* 325 F.3d at 657. The focus of a "regarded as" claim is the reaction and perception of the relevant decisionmakers working with the plaintiff; the opinions or perceptions of other individuals involved are of little legal significance. *Deas v. River West, L.P.,* 152 F.3d 471, 476 n. 9 (5th Cir.1998). Evidence that an employer was merely aware of an impairment is not sufficient to survive summary judgment. Under the ADA, a plaintiff must show she is "regarded as" having an impairment that *substantially limits* one or more major life activities. *Id.* at 476 (plaintiff must

produce "sufficient evidence for a reasonable trier of fact to conclude that [the employer] perceived her as having an 'impairment' *and* that this impairment, if it existed as perceived by [the employer], would have substantially limited one or more of [plaintiff's] major life activities").

In the present case, Cato does not argue that her impairments were only limiting because of the attitudes of coworkers or that she had no impairment despite her employer's perceptions, therefore Cato's disability under the "regarded as" prong turns on the first definition. Because the evidence indicates only Harvey Gordon Hogue, Joe Farmer, Johnny Henry, and Robert Slider were involved in the decision not to promote Cato, *see* Hogue Dep. at 47, only evidence of their perceptions of Cato's impairment is relevant to the "regarded as" inquiry.

Plaintiff does not specify which major life activity her superiors perceived was substantially limited by her impairments. Because the only major life activity Plaintiff references with respect to her contention that she was "regarded as" disabled is working, the court will consider this activity in analyzing the perception of substantial limitation. *See* Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. at 12. When the major life activity at issue is working, "substantially limits" is defined as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(i). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* Therefore, while "working" is considered a major life activity, "working does not mean working at a particular job of one's choice." *Dupre v. Harris County. Hosp.*

*Dist.,* 8 F.Supp.2d 908, 917 (S.D.Tex.1998) (internal quotations omitted).

Cato's summary judgment evidence is replete with evidence that her superiors were aware she suffered from lupus and asthma. Hogue admits, for instance, that he and Cato discussed her asthma and even compared medications. Hogue Dep. at 10. In addition, the evidence is clear that Hogue and others at the bank were aware of Cato's lupus. Hogue Dep. at 10–11. What is not apparent, however, is that her superiors perceived these impairments to *substantially limit* the major life activity of working at the time she was denied the promotion in the Imaging Department.

The evidence Cato offers to support her conclusion that she was regarded as disabled is insufficient to create a genuine issue of material fact. First she relies on a conversation between she and Tammy Byrum, the human resources supervisor, in which Byrum suggested Cato apply for disability. Because Byrum was not involved in the decision to promote Cato, her perceptions of Cato's impairments are irrelevant to the present inquiry. Although Hogue admits he was aware of the conversation between Byrum and Cato, his deposition testimony also indicates the conversation was not relayed to him until after Cato had left the bank—after the decision not to promote Cato was made:

Q: Do you remember how the issue came up when Ms. Byrum told you about it?

A: The part I can recall, we were just discussing if Dawn was coming back or not because we did not know. We didn't know if she was coming back or not. And she said—she had told me that she had suggested it, if Dawn had any interest to do that, to file for the work—long-term disability.

Hogue Dep. at 19. Therefore, the conversation between Cato and Byrum does not create a fact issue as to whether her superiors regarded Cato as disabled when they made the decision not to promote.

Next Cato points to the testimony of Charlotte Chancler regarding her conversation with Byrum as evidence that she was regarded by her superiors as disabled. In relevant part, Chancler testified:

> I asked [Bryum] if she was aware of what stress did to someone that had lupus. She said she did and that is why they had made the decision to make Julie the supervisor of the Imaging Department. She also started trying to get me to talk to Dawn about coming in to work a few hours a day even though Dawn's physician has [sic] her on medical leave. We also talked about Dawn needing to go see a therapist to help the other issues this whole situation brought up.

Chancler Dep. at 46. Viewed in the light most favorable to the plaintiff, this testimony cannot be construed to create a fact issue as to whether Cato's superiors regarded her as *substantially limited* in the major life activity of working. All this testimony indicates is that Cato's superiors and others around the bank believed Cato's impairments made her unfit for a particular job; not that she was unfit for a broad class of jobs.

Plaintiff also suggests that Hogue's comments to Chancler, regarding the decision not to promote Cato, imply that she was perceived as being disabled when she was denied the promotion. Plaintiff points to testimony regarding a conversation between Chancler and Hogue as evidence of this perception:

> Q: Was there anything else in that meeting with Gordon that you can tell me that you remember? Anything else that he said or you said?

> A: It was just a lot, you know, just about that her ailment, you know,— that this had to be a consideration or something. Just like Tammy, that the stress of doing the job and the hours and physically hard and that same kind of stuff, you know. . . .

> Q: And then you can refer to your notes if you want, but I want you to tell me as best you can recall what Mr. Hogue said.

> A: Well, I didn't put it verbatim, but I put that I went in there on a work-related issue. He asked me if I had talked to Dawn. We talked about what stress does to someone with lupus. He told me that Dawn should come back and do her job as she had been. . . .

> Q: I got you. I understand. As we sit here today now is that your best recollection of what happened with Mr. Hogue?

> A: Pretty close. You know, he knew about lupus and what the stress does, and in my honest opinion—or my recollection, he discussed that he knew that that position was a stressful position, the one downstairs, and the training of it and all that.

Chancler Dep. at 12, 14–15. This testimony indicates Cato's superiors were aware of her disability, and at best that they regarded her as unfit for a particular position because of her disability. Nothing in this exchange, however, creates a fact issue as to whether Cato's superiors regarded her as unable to perform either a class of jobs or a broad range of jobs as required by the ADA. *See* 29 C.F.R. § 1630.2(j)(3)(i).

Finally, Plaintiff points to the deposition testimony of former Bank employee Lisa

Somerville Ibarra as evidence of discrimination against Cato:

Q: And within your statement you mentioned discussing the matter with Mr. Hogue and that, quote, "He discussed his own personal issues and health concerns of Dawn with me, and said with a smile that Dawn had 'management issues.'"

A: He didn't go into detail—in my memory I don't have the exact details of what he said, but yes, he did discuss those things with me."

Q: And those things being the health concerns and the management issues?

A: Yes.

Somerville Ibarra Dep. at 42–43. Here, Hogue's indication that Cato had "management issues" does not suggest that she was impaired from performing any job available at the bank. Instead, it simply indicates that she was unfit, because of her disability or otherwise, for a particular management position. Like the evidence discussed above, this testimony does not create a fact issue as to whether Cato was regarded as *substantially limited* from performing a broad range of jobs.

In *Deas*, the Fifth Circuit upheld summary judgment under similar circumstances. *See Deas*, 152 F.3d at 482. Specifically, the court determined evidence of an employer's belief that the employee was "incapable of fulfilling the essential functions of an 'addiction technician' in a hospital substance abuse treatment unit does not establish that she regarded her as being substantially limited in her ability to work in general." *Id.* at 481. In that case, the plaintiff suffered from seizures which her employer determined would make working with substance abuse patients unsafe. *Id.* Testimony indicated that the employer "only perceived the seizures as a problem because employment in a substance abuse unit required a certain

level of vigilance that an individual suffering from seizures would be unable to provide." *Id.* The court determined that this evidence simply did not support the assertion that the employer regarded the plaintiff as unable to work in a broad range of jobs. *Id.* Likewise, in the present case, the evidence before the court indicates only that Cato's supervisors feared the stress of a particular managerial position would be too great for someone suffering from lupus. There is no evidence to suggest that Cato was regarded as unable to perform a broad class of jobs. Therefore, the court finds there is no genuine issue of material fact as to whether Plaintiff was "regarded as" having an impairment that substantially limited a major life activity on or before September 5, 2007.

Based on the foregoing, Defendant's motion for summary judgment is **GRANTED** with respect to Plaintiff's failure to promote claim. The court finds that Plaintiff has failed to establish a genuine issue of material fact that Plaintiff was disabled or regarded as disabled at the time she was denied the promotion. Specifically, Plaintiff failed to put forth evidence to create a triable fact issue as to whether her impairments substantially limited a major life activity or were regarded as substantially limiting a major life activity.

**2. Reasonable Accommodation**

 Under the ADA, an employer "discriminates" against an employee if it fails to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). EEOC regulations define "reasonable accommodation" as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individ-

ual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii); *Chevron*, 570 F.3d at 621. To assert a claim under the ADA's accommodation provisions, Plaintiff must show: (1) she requested a reasonable accommodation; and (2) that she was a qualified individual with a disability at the time the request for accommodation was made. *See Agro*, 555 F.3d at 471. A request for accommodation must "explain that the adjustment in working conditions or duties she is seeking is for a medical condition-related reason, but the employee does not have to mention the ADA or use the phrase 'reasonable accommodation.'" *Chevron*, 570 F.3d at 621. Once such a request is made, the employer is required to engage in an "interactive process: a meaningful dialogue with the employee to find the best means of accommodating that disability." *Id.* (internal quotation omitted). "When an employer does not engage in a good faith interactive process, that employer violates the ADA—including when the employer discharges the employee instead of considering the requested accommodations." *Id.*

■ Plaintiff alleges she was denied a reasonable accommodation in violation of the ADA. Compl. ¶ 13. According to Plaintiff she was "placed in a room in the basement with significant mold and mildew." *Id.* Even though the mold and mildew were detrimental to her condition, Cato alleges the Bank refused to accommodate her by taking care of the mold and mildew or moving her to another part of the office. *Id.* Although Plaintiff does not specify in her Complaint when her initial request for reasonable accommodation was made and denied, her arguments in opposition to summary judgment suggest she requested and was denied accommodation on an ongoing basis which culminated in a doctor's note dated September 12, 2007:

Additionally, it is clear that Plaintiff Cato complained of mold and mildew in the basement which made her problems with asthma and allergies worse. The problem would result in Plaintiff Cato gasping for air. Witness Charlotte Chancler made it clear that the problem was not resolved until after Plaintiff Cato was gone. The problem is further addressed in Dr. Ajay Bedekar's September 12, 2007 letter requesting the accommodation.

Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. at 14.

■ To the extent Plaintiff alleges reasonable accommodations were requested and denied prior to September 12, 2007, the court finds no evidence in the record to support such a contention. First, as discussed above, Plaintiff has failed to create a triable issue as to whether her physical impairments substantially impaired any major life activity prior to September 5, 2007. Therefore she has failed to demonstrate that she was a qualified individual entitled to accommodation under the ADA. Even assuming *arguendo* the protections of the ADA applied, there is no indication that any request for accommodation related to her mold and mildew allergies was made prior to September 12, 2007. Instead, Plaintiff makes the conclusory allegation that Defendant knew the mold and mildew adversely affected her condition but "refused to accommodate her by taking care of the mold and mildew or moving Plaintiff Cato away from it." *Id.* at 5; Cato Aff. ¶ 5. Plaintiff has not presented any evidence describing what accommodation was requested or when Defendant denied an accommodation. Plaintiff, for instance, never requested that the Bank purchase an air purifier for her office. *See* Cato Dep. at 58. Nor is there any evidence before the court that Plaintiff asked to be moved to an office in a different part

of the building. The ADA does not require employers to "anticipate all the problems that a disability may create on the job and spontaneously accommodate them." *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 n. 4 (5th Cir.1999). Although Plaintiff may have told others at the bank about mold and mildew in the basement and its affect on her allergies, an employee must make a request for accommodation to trigger the protections of the ADA. *See Chevron*, 570 F.3d at 621. Nothing in the record indicates that such a request was made prior to September 12, 2007.

The only request for accommodation related to the mold and mildew in Cato's basement-office this court is aware of is a note from Plaintiff's doctor dated September 12, 2007. According to that note, Cato's work environment contributed to her asthma and a change in the location of her office may alleviate her symptoms:

> Ms. Dawn Cato is under my care for allergic rhinitis and asthma. We clearly believe that her respiratory symptoms have been greatly exacerbated by the fact that she is exposed to mold in the basement in the building in which she works ... We are consequently recommending that she be able to transfer out of this environment. She has otherwise, a full functional status and would be able to perform whatever tasks is [sic] required of her in her present job, but we believe that the current environment will likely result in ongoing debilitating symptoms.

Pl.'s Ex. 7. When this request was made, however, Plaintiff had been on medical leave from work since September 6, 2007. Additionally, in her application for long term disability, Plaintiff stated that she became unable to work because of her impairments on September 10, 2007:

> In connection with Ms. Cato's application for disability benefits to the Bank's disability carrier, Standard Insurance Company, I have received her Employee's Statement in which she claims that she became unable to work as a result of disability on September 10, 2007. In addition, I have received a determination letter from Standard Insurance Company stating that Ms. Cato "became disabled" on September 6, 2007.

Byrum Aff. ¶ 20. Defendant argues that because Plaintiff claims she was completely disabled and unable to work after September 6, 2007, no accommodation was possible after that date. The court agrees. Plaintiff cannot at once claim that for the purposes of insurance she is completely disabled, but that for the purposes of the ADA she is a "qualified individual with a disability"—or a person "who with or without reasonable accommodation, can perform the essential functions" of her job. 42 U.S.C. § 12111(8); *see Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (holding plaintiff must provide sufficient explanation of contradiction between statement of ability to work in ADA claim and SSDI total disability claim).

Even if the court assumes Plaintiff was able to work on or after September 12, 2007, Plaintiff does not offer any evidence that Defendant denied her request for accommodation. Instead, the evidence before the court indicates that after receiving notes from Plaintiff's doctors on September 12 and 20, 2007, Defendant's human resources representative contacted Cato to discuss her work status. Byrum Aff. ¶ 14. Although the content of these conversations did not necessarily amount to an interactive discussion of reasonable accommodation, Plaintiff's repeated statements that she could not return to work in any capacity made such a discussion impossible. *Id.* ("[Cato] advised there was 'no way' she could return to work at that time ...."); *see Agro*, 555 F.3d at 471 (noting

reasonable accommodation analysis hindered when plaintiff did not show up for work following request for accommodation).

▮ Plaintiff asserts that she had hoped to return to work as soon as her medical condition would allow. Cato Aff. ¶ 11; Cato Dep. at 30–31. However, a mere request for extended leave does not constitute a request under the ADA for continuing accommodations at work. *See Dortch v. Mem'l Herman Healthcare Sys.-Sw.*, 525 F.Supp.2d 849, 873 (S.D.Tex. 2007). To constitute a request for accommodation under the ADA, documents or medical records must indicate an ongoing health problem that necessitates accommodation upon the employee's return. *Id.* In the present case, Plaintiff's doctors indicated only that further observation and absence from work would be necessary. *See* Pl.'s Ex. 9–10. The medical records and evidence before the court do little to suggest what accommodations would be necessary upon her return or even when she might return to work. *See* Pl.'s Ex. 7–10. The ADA does not require an employer to allow a disabled employee to take an indefinite leave for purposes of accommodation. *Bennett v. Calabrian Chems. Corp.*, 324 F.Supp.2d 815, 838 (E.D.Tex.2004). Therefore, there is nothing in the record to indicate Cato was denied a reasonable accommodation in violation of the ADA.

With respect to Plaintiff's claims for failure to provide reasonable accommodation, Defendant's motion for summary judgment is **GRANTED**.

### B. Retaliatory Discharge

▮ To make a *prima facie* case of unlawful retaliation, a plaintiff must establish: (1) she engaged in an activity protected by the ADA; (2) an adverse employment action; and (3) a causal connection between the protected act and the adverse action. *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir.1999). Once the plaintiff

has established a *prima facie* case, the defendant must come forward with a legitimate, non-discriminatory reason for the adverse employment action; and if such a reason exists, the plaintiff must adduce evidence to show the proffered reason is pretextual. *Id.* For the purpose of establishing a *prima facie* case, close proximity between the protected act and the adverse action is sufficient to prove a causal link. *Matthews v. City of Houston Fire Dep't*, 609 F.Supp.2d 631, 646 (S.D.Tex.2009) (discussing retaliation in the context of Title VII). Ultimately, however, the employee must show that "but for" the protected activity the adverse action would not have occurred. *Seaman*, 179 F.3d at 301; *see also Strong v. Univ. Healthcare Sys. L.L.C.*, 482 F.3d 802, 808–09 (5th Cir.2007) ("[w]ithout more than timing allegations . . . summary judgment in favor of [the defendant] was proper").

▮ In the present case, Plaintiff argues there is evidence of retaliatory discharge because Defendant terminated her employment less than two months after her Charge of Discrimination with the EEOC. Additionally, Plaintiff claims that other employees were permitted to take unspecified amounts of time off for medical conditions. *See* Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. at 15. Essentially, Plaintiff argues evidence other employees were treated differently shows Defendant's proffered reasons for her discharge were pretextual and that the close proximity between her termination and the filing of the EEOC charge is evidence that "but for" her charge of discrimination the adverse action would not have occurred. The evidence offered by Plaintiff, however, is not sufficient to create a fact issue that "but for" her charge of retaliation Cato would not have been discharged.

Plaintiff relies on the Fifth Circuit's decision in *Shackelford v. Deloitte & Touche*,

*LLP,* 190 F.3d 398, 407–08 (5th Cir.1999), to support her conclusion that evidence of temporal proximity alone can establish "but for" causation. This reliance is misplaced. First, the facts in *Shackelford* are distinguishable from those in the case at bar. In that case, the plaintiff was fired the same day her employer allegedly overheard her discussing claims of racial discrimination with an attorney, one day after she attempted to meet with her supervisors involving racial discrimination, and one week after she testified in a suit against her employer involving racial discrimination. *Shackelford,* 190 F.3d at 408. The Fifth Circuit reversed the district court's order granting summary judgment, finding that a reasonable juror could find the employer's proffered reason for the discharge—that Shackelford had been hoarding tax returns—was merely pretextual. *Id.* at 409. The facts in the present case are markedly different. Cato's charge of discrimination was filed after she had been absent from work on paid medical leave for almost a month. There is no indication in the evidence before the court that Cato was harassed about her EEOC charge or that her employer made any attempt to discuss the charge with her. Instead, conversations between Cato and the Bank during the months of October, November, and December related to her intentions regarding her return to work and her expectations regarding paid medical leave. Additionally, prior to her departure from work on September 5, 2007 and prior to her EEOC charge, Cato had been reprimanded for deleting vendor information from a computer database. The fact that other employees were granted longer periods of medical leave does not establish that Cato was treated differently because of her EEOC charge. The only proof Cato offers that "but for" her charge of discrimination she would not have been discharged, is the "close timing" between her claim with the EEOC and her ultimate discharge. Evidence of "close timing" alone is not sufficient to avoid summary judgment.

The Fifth Circuit has disapproved of cases that overemphasize the reliance on temporal proximity in establishing "but for" causation:

> [t]o prevent future litigants from relying on temporal proximity alone to establish but for causation, we once again attempt to clarify the issue ... [Supreme Court precedent] makes clear that (1) to be persuasive evidence, temporal proximity must be very close, and importantly (2) temporal proximity alone, when very close, can in some instances establish a *prima facie case* of retaliation. But we affirmatively reject the notion that temporal proximity standing alone can be sufficient proof of but for causation. Such a rule would unnecessarily tie the hands of employers.

*Strong,* 482 F.3d at 808. Here, as in *Strong,* Cato has adduced insufficient evidence of retaliation: Cato has not shown that she was harassed about her EEOC complaint; her disciplinary record was not completely clean prior to her complaint; and she had been absent from work for almost four months when she was ultimately discharged. *Cf. id.* Because Cato's only real evidence of retaliation is the "close timing" of her charge of discrimination and ultimate termination, summary judgment is proper.

Plaintiff has failed to create a genuine issue of material fact as to her claim of retaliatory discharge. Accordingly, Defendant's motion for summary judgment is **GRANTED.**

## IV. CONCLUSION

Defendant's motion for summary judgment is granted in its entirety. Plaintiff has failed to adduce evidence that creates a genuine issue of material fact for her

failure to promote, failure to provide reasonable accommodation, and retaliatory discharge claims.

**IT IS SO ORDERED.**